479 F.2d 701
 UNITED STATES of America ex rel. Luther MILLER, Plaintiff-Appellant,
v.
John J. TWOMEY, Warden, and Peter B. Bensinger, Director,
etc., Defendants-Appellees.
Andrew GREEN, Plaintiff-Appellant,
v.
Peter BENSINGER et al., Defendants-Appellees.
Jack R. THOMAS, Plaintiff-Appellant,
v.
Peter B. BENSINGER, etc., et al., Defendants-Appellees.
Herman KRAUSE and Willie Moore, etc., et al., Plaintiffs-Appellees,
v.
Wilbur J. SCHMIDT, etc., et al., Defendants-Appellants.
Alfred ARMSTRONG et al., Plaintiffs-Appellants and
Plaintiffs-Intervenors-Appellants,
v.
Peter B. BENSINGER et al., Defendants-Appellees.
Simon S. GUTIERREZ, Plaintiff-Appellant,
v.
DEPARTMENT OF PUBLIC SAFETY, et al., Defendants-Appellees.
 Nos. 71-1854, 71-1869, 71-1870, 72-1395, 72-1712, 72-1713
and 71-1370.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 6-8, 1972.
Decided May 16, 1973.
Rehearing Denied in No. 71-1854 July 20, 1973.
 
 James M. Rosenbaum, Marilyn R. Brown, Minneapolis, Minn., Andrew Martin Green, Carbondale, Ill., John F. Ebbott, c/o Freedom Through Equality, Milwaukee, Wis., Michael Deutsch, Jeffrey H. Haas, Mark Kadish, Chicago, Ill., David Goldberger, c/o American Civil Liberties Union, Chicago, Ill., John A. Rupp, Cook County Legal Assistance Foundation, Brookfield, Ill., John F. McGuire, Berwyn, Ill., for plaintiffs-appellants.
 William J. Scott, Atty. Gen., Ronald Hanna, Charles H. Levad, Jayne A. Carr, Asst. Atty. Gen., Chicago, Ill., Robert W. Warren, Atty. Gen., Mary V. Bowman, Asst. Atty. Gen., Madison, Wis., for defendants-appellees.
 Before SWYGERT, Chief Judge, and PELL and STEVENS, Circuit Judges.
 STEVENS, Circuit Judge.
 
 
 1
 These cases, all presenting questions relating to the internal administration of state prisons, require us to consider the implications of Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, which was decided while these appeals were pending. In all cases, prisoners allege violations of federal rights protected by 42 U.S.C. Sec. 1983; conversely, the prison officials all contend that their conduct was within an area of discretion which is not properly reviewable by a federal court.
 
 
 2
 In Miller, Green, and Thomas, three different district judges dismissed without any hearing pro se complaints challenging the Illinois procedures for denying "good time" credits. In Krause, the court held that due process must be afforded before the state can punish inmates by segregation or revocation of good time credits: the Wisconsin authorities appeal from the issuance of a preliminary injunction which, they contend, improperly limits their power over prisoners. In Armstrong, a group of prisoners claim that, without adequate procedural safeguards, they were placed in a "Special Program Unit" because they were allegedly more dangerous than the general prison population; on appeal, the prisoners argue that the relief granted by the district court was insufficient. Finally, in Gutierrez, a prisoner who was severely injured by a fellow inmate sued the warden for damages because he failed to segregate the violence-prone assailant from the general prison population; the district court dismissed the action.
 
 
 3
 At the outset, we are confronted with the impact of Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). For it is now clear that to the extent these prisoners seek the restoration of good time credits, their remedy is by way of habeas corpus rather than by Sec. 1983. It is also clear that a pleading filed under Sec. 1983 may be read to claim habeas corpus relief. Cf. Wilwording v. Swenson, 404 U.S. 249, 251, 92 S.Ct. 407, 30 L.Ed.2d 418. However, neither in the district courts nor in this court did any defendant raise any objection to jurisdiction prior to the decision in Preiser. Unlike the situation in Preiser where both the existence of a New York remedy and the failure to invoke it were perfectly clear, neither the briefs nor the records shed any light on the availability of possible state remedies in either Illinois or Wisconsin. Compare Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, with Marino v. Ragen, 332 U. S. 561, 567-570, 68 S.Ct. 240, 92 L.Ed. 170 (Mr. Justice Rutledge, concurring). We are therefore not in a position to determine whether an unargued defect in jurisdiction is present. For that reason, our disposition of these cases will not foreclose a fresh examination of the jurisdictional issue in the district courts after remand. We express no opinion on the legal questions relating to the existence of state remedies nor on any factual determination that may be necessary on the exhaustion issue. Nor do we express any opinion on the possible significance of Preiser on questions relating to punitive segregation.
 
 
 4
 Because our consideration of the various questions presented must take into account the manifold problems that recur in a prison society, we shall first summarize the facts of these cases; we shall then consider the impact of Morrissey before ruling on the specific legal issues presented.
 
 I.
 
 5
 A. Miller, Green and Thomas.
 
 
 6
 Each of these pro se complaints, fairly read, alleged that a revocation of statutory good time constituted a deprivation of liberty without due process of law. By statute an Illinois prisoner is entitled to receive good time credits for good behavior;[1] such credits reduce the maximum sentence he must serve and also may accelerate the date on which he becomes eligible for parole.[2] If prison rules are violated, good time credits may be revoked or withheld as punishment.
 
 
 7
 Miller's complaint alleged that on May 12, 1969, 90 days of statutory good time was revoked on the ground that he had "indirectly" called an officer a foul name; his next appearance before the Parole Board was therefore delayed and he also suffered a loss of other privileges. He alleged that the discipline was imposed pursuant to prison rules promulgated approximately 19 years ago; and that the proceedings "were held 'ex parte' with petitioner having no representation, nor defense." The day after the complaint was filed, the district judge, on his own motion, dismissed the complaint as "frivolous."[3]
 
 
 8
 Green's complaint included several different claims; the issues on appeal, however, relate only to the dismissal of the allegations relating to the revocation of 21 months of statutory good time. Green alleged generally that the due process clause was violated by the manner in which the "Merit Staff" took away good time on the recommendation of three penal officers[4] without permitting him to appear in defense.
 
 
 9
 Respondents' affidavits contain a more detailed description of the customary procedure. The affidavit of the Warden of the Illinois State Penitentiary at Joliet, where Green is confined, states:
 
 
 10
 "It is my understanding that prior to November 1970, the following procedure was used in revoking a prisoner's Statutory Good Time: The prisoner was called to the Isolation Building on a call ticket, the disciplinary charge was read to the prisoner, and he was asked whether it was true or false. On major violations of the rules, the two captains would decide what action was to be taken against the prisoner. If the charge was serious enough, they would also refer his case to the Merit Staff for further action. If the prisoner emphatically denied the charge, the captains would investigate the incident. When his case was referred to the Merit Staff, the charges would be read by the captain to the full committee, the case would be discussed, and they would recommend the penalties to be given to the prisoner. If the penalty was the loss of Statutory Good Time, the recommendation would have to be approved by the Warden and then sent to the General Office in Springfield, Illinois, for the final approval of the Director of the Department of Corrections."[5]
 
 
 11
 *****
 
 
 12
 * * *
 
 
 13
 Respondent states that under the rules of the Department of Corrections then in effect, good time was not revoked until after the prisoner had committed at least four rule infractions.[6] According to his disciplinary report, Green committed four such offenses between October 9, 1965, and February 17, 1966, and thereafter was eligible for deprivation of any part or all of the good time he had earned, or might thereafte earn.[7] In five separate disciplinary actions between March 7, 1967, and January 8, 1970, Green lost a total of 21 months of good time.[8]
 
 
 14
 The district court found petitioner's allegations insufficient. The court held that the Constitution requires only that "the facts be rationally determined" and that the inmate "be afforded a reasonable opportunity to explain his actions." The court decided that Green's allegations did not establish a failure to satisfy those requirements.[9]
 
 
 15
 Thomas's complaint alleges that without an adequate hearing he was placed in solitary confinement for 15 days for sending a letter to an ex-inmate in an illegal way.[10] The record also reveals that one month of his statutory good time was revoked. The district court dismissed his complaint on the authority of Walker v. Pate, 356 F.2d 502 (7th Cir. 1966), cert. denied 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678.[11] On appeal, he seeks restitution of this good time.
 
 
 16
 Counsel for Green, Miller and Thomas have limited their contentions in this court to the issues concerning their loss of statutory good time. In each of these cases the challenged action took place before the change in disciplinary procedures which became effective on December 1, 1970.[12] The specific procedural defects which they challenge are summarized in their brief as follows:
 
 
 17
 "Plaintiff-Appellants urge this Court to find the rules and procedures under which they were deprived of their accrued good time and of the opportunity to earn additional good time to be null, void, and without effect for these reasons:
 
 
 18
 "a. They were not provided with sufficient prior notice of the charges against them.
 
 
 19
 "b. They were not provided with an opportunity to confront and crossexamine their accusers or call witnesses in their own defense.
 
 
 20
 "c. They were not provided with counsel or a counsel-substitute.
 
 
 21
 "d. There was no written record kept of the proceedings with a consequent denial of opportunity to appeal on any kind of objective record."
 
 
 22
 B. Krause and Moore.
 
 
 23
 This case arises out of an incident which occurred at the Wisconsin State Reformatory in Green Bay on November 12, 1971. As a result of a disturbance in the dining hall, windows were broken, fires were set, reformatory personnel were assaulted, and guards as well as inmates were injured. Various disciplinary hearings ensued and Krause and Moore were both placed in "indefinite lower segregation." They filed this class action on behalf of all inmates at Green Bay "who have been denied the right to due process in disciplinary proceedings," and promptly moved for preliminary injunctive relief. For the purposes of that motion, the court made the following findings:
 
 
 24
 "The Wisconsin Division of Corrections has promulgated a set of procedures to govern the operation of intra-institutional disciplinary hearings. Manual of Adult Institutions Procedures, Secs. 5.9, 5.10 (Revised October, 1967; August, 1971). At all times material to this action, such procedures were in effect at the Green Bay Reformatory. The procedures provide that all inmates 'cited for other than minor breaches of discipline', will be brought before a disciplinary committee. The committee is to be composed of three members, the Associate Warden of Security, the Associate Warden of Treatment, and a rotating member from the general staff. Sec. 5.9(a). Proceedings before the committee may be instituted only by the filing of a written complaint with a member of the committee by either a corrections officer or a staff member. Sec. 5.9(c). Committee sessions are held at such intervals 'as will assure prompt disposition of all cases.' Sec. 5.9(b). No form of punishment is to be administered prior to committee action 'except for proper restraining measures in unusually serious incidents.' Sec. 6.9(b). The committee considers only written reports signed by the staff member or officer bringing the complaint. The written report presented to the committee is given to the inmate, 'if at all possible,' several hours prior to his appearance before the committee (Modification # 1, revision of August, 1971); the accused inmate is given the opportunity to appear before the committee, to present statements to the committee, answer any questions of committee members, and provide any information sought by the committee. Sec. 5.9(c). After taking the evidence, the committee may deliberate privately and announce its decision to the inmate immediately thereafter. Sec. 5.9(d). The action of the committee is documented in a prescribed space on the original conduct report 'with a concisely written statement (one or two sentences) giving justification for the action taken.' Modification # 4, revision of August, 1971.) Should the inmate wish to appeal the committee's action, the committee is to submit its findings to the Warden or Superintendent for final decision. Sec. 5.9(a).
 
 
 25
 "The rules recited above constitute the entire set of written procedures governing the conduct of disciplinary hearings at the Reformatory. Neither the Manual of Adult Institutions Procedures nor any of the amendments thereto provide any further procedures.
 
 
 26
 "Section 5.10 of the Manual of Adult Institutions Procedures empowers the disciplinary committee to impose sanctions on an inmate adjudged guilty of a misconduct charge. The Manual of Procedures does not list the range of possible punishments, but in practice, two of the more serious sanctions imposed are confinement in 'lower segregation' and confinement in 'upper segregation.'
 
 
 27
 "An inmate in the general population rooms in a cell of 'adequate' size and sleeps on a bed of 'some comfort.' He is permitted to retain certain personal toiletries, such as soap, a shaving kit, toilet paper, towels, a toothbrush, toothpaste and shampoo. He may either attend school at the reformatory or participate in a reformatory work program. If he chooses to work, he earns money for the work performed. He is allowed to leave his cell for various portions of the day (either for school or work) and, in addition, is permitted to engage in recreation on certain weekdays and weekends. He is allowed to talk with other inmates and, if he remains in the general population, he may accumulate 'good time' which will hasten his mandatory release date.
 
 
 28
 "The prisoner confined in 'lower segregation' is not permitted to work and thus can earn no money with which to purchase articles sold in the canteen, such as soap, toothpaste and cigarettes. He must sleep on a 'hard' bed with just one sheet, a pillow and pillowcase. He is permitted no personal toiletries except a face towel and soap. He may leave his cell for a total of thirty minutes each week. And he may not earn 'good time,' a factor which delays his mandatory release date. If he is sentenced to 'indefinite idle' status in lower segregation, he may be confined there for a period ranging from two to four months.
 
 
 29
 "'Upper segregation' is called 'the hole' by administration and inmates alike. The cell size is 12'x5'; there is a cot with a mattress that is four inches thick; neither sheets nor pillow is provided for the cot. In the cell there is a bare light bulb that is always turned on, thus making it difficult to sleep. No toiletries are allowed: inmates must ask the guard on duty for soap and for toilet paper. The only reading matter permitted in the cell is the Bible, and no radios are allowed. The prisoner is not permitted to exercise; nor is he allowed to leave his cell. He may talk with no one (if he is caught speaking, he is penalized with another day in 'the hole'). No money can be earned and no good time may be accumulated.
 
 
 30
 "Misconduct 'convictions,' no matter what the sanction imposed for them, are referred to the parole board and affect adversely the inmate's application for parole.
 
 
 31
 "On November 12, 1971, plaintiffs were reported to the disciplinary committee for alleged infractions arising out of a disturbance that occurred at the Reformatory on the evening of November 12. The charges against the plaintiffs were heard by the disciplinary committee on November 19, 1971. The members of the committee were Donald Clusen, Associate Warden Security, Kenneth Mathys, Associate Warden Treatment, and Robert Rosera, a corrections officer. On the morning of November 19, two or three hours in advance of their hearings, plaintiffs were given copies of the conduct reports filed against them. Each plaintiff had a private hearing before the committee, at which the conduct report was read to him. Each was given an opportunity to explain his actions and was asked questions by members of the committee. After hearing the plaintiffs and deliberating privately, the committee found plaintiff Krause guilty and sentenced him to indefinite idle in the lower segregation unit and found plaintiff Moore guilty and sentenced him to ten days in the upper segregation unit, followed by confinement in the lower segregation unit under indefinite idle status." 341 F.Supp. 1001.
 
 
 32
 Relying largely on the rationale of his earlier decision in Morales v. Schmidt, 340 F.Supp. 544 (W.D.Wis.1972), rev'd, (7th Cir. 1973), the district court concluded that preliminary relief was warranted and entered an order which, as amended, enjoined defendants "from conducting any further disciplinary hearings with respect to the named plaintiffs which may result in either forfeiture of 'good time' or confinement in either upper or lower segregation, unless and until such disciplinary hearings shall include the following procedures: timely and adequate notice of the charge and of the hearing on the charge; an opportunity for the accused to confront and to cross-examine adverse witnesses; an opportunity to retain counsel or some reasonable substitute for counsel; an impartial decision-maker; and a brief summary of the evidence on which the decision is based." The defendant prison officials have appealed from that order and also from an order denying a stay pending appeal on the merits.
 
 
 33
 C. Armstrong.
 
 
 34
 Armstrong and certain other named plaintiffs represent a class of inmates who were placed in a "Special Program Unit" in the Penitentiary at Joliet, Illinois. After a full evidentiary hearing the district court made findings favorable to their contention that they had been denied procedural due process, but rejecting their claim that the S.P.U. constituted cruel and unusual punishment. On this appeal, plaintiffs do not press their Eighth Amendment claim, but they do argue that the procedural safeguards ordered by the district court are inadequate.
 
 
 35
 Like Krause, this case arises out of a violent disturbance. The court's findings describe the background which led to the creation of the Special Program Unit:
 
 
 36
 "On June 25, 1971, with several hundred inmates present, a fight erupted on the baseball field at Stateville Penitentiary, Joliet, Illinois, among a group of inmates. When a few correctional officers attempted to halt the fight, they were surrounded by many inmates in a threatening manner. However, order was restored without the use of weapons or gas.
 
 
 37
 "Subsequent to this altercation, the Warden of Stateville, defendant John Twomey, placed the institution on a restricted status. This restricted status encompassed a general lock-up of all but a few inmates, and lasted until July 14, 1971.
 
 
 38
 "In early July of 1971, a cross-section of the prison staff, including, inter alia, superintendents, captains, and lieutenants, was surveyed in an attempt to identify those inmates who were generally considered 'agitators' and 'trouble-makers.' All of the inmates so identified as security risks were retained in the B-House section of the prison.
 
 
 39
 "In October, 1971, over one hundred of these 'security risk' inmates were transferred to the Special Program Unit in the Joliet Prison. These inmates, comprising the plaintiffs in the instant suit, are still confined in the Special Program Unit.
 
 
 40
 "The Special Program Unit is described in the 'Manual Of Operations for Special Program Unit.' According to the Manual, the Unit was 'designed to remove . . . serious behavioral problems from [the prison's] general population.' The primary responsibility for assigning individual inmates to the Special Program Unit rests with the Reception and Diagnostic Services staff of the institution. However, the Disciplinary Committee of the institution may recommend that an inmate be placed in the Unit.
 
 
 41
 "The Special Program Unit is operated as a three-stage progressive system, whereby an inmate can earn greater privileges and promotion to successive stages and ultimately can progress to the point where he will be considered for release. There are no specified standards for progression from one stage of the unit to another.
 
 
 42
 "Before this suit proceeded to trial, the parties entered into a stipulation, dated April 18, 1972, which is pertinent to the issues involved. This stipulation stated, inter alia, that before these plaintiffs were placed in the Special Program Unit
 
 
 43
 "(1) There was no written notice of charges;
 
 
 44
 "(2) There were no specific charges against plaintiffs, other than that they were 'security risks' to the general welfare of the prison;
 
 
 45
 "(3) No evidence was presented against plaintiffs during any of the interviews which were conducted;
 
 
 46
 "(4) Plaintiffs' transfer to the Special Program Unit was based upon no written or published rule other than the Special Program Unit Manual;
 
 
 47
 "(5) Plaintiffs were not afforded the assistance of counsel;
 
 
 48
 "(6) Plaintiffs were not furnished a hearing before a disinterested official;
 
 
 49
 "(7) Plaintiffs were not allowed to call witnesses;
 
 
 50
 "(8) Plaintiffs were not given an opportunity to cross-examine accusers or examine reports; and
 
 
 51
 "(9) There is no transcript or recording of any hearing."[13]
 
 
 52
 After reviewing the relevant testimony, the court rejected defendants' contention that the S.P.U. was "a rehabilitative program" and specifically found that confinement in the S.P.U. was a form of punishment.[14] Based on that finding he concluded "that before an inmate is placed in the Unit he should be afforded an administrative hearing which would reasonably satisfy the concept of due process." Specifically, he held that "he should be informed of all of the accusations against him and given an opportunity to respond to such charges."[15]
 
 
 53
 He relied on this court's decision in Adams v. Pate, 445 F.2d 105, 108 (1971), as requiring such minimal protection and also as requiring rejection of plaintiff's claim that due process also mandates: "(a) prior notice of the charges against the prisoner; (b) a recorded hearing before an impartial arbiter with an opportunity to cross-examine adverse witnesses and to call witnesses in his own behalf; (c) the right to retain counsel or counsel substitute; (d) a decision rendered in writing; and (e) . . . an opportunity to appeal."[16]
 
 
 54
 D. Gutierrez.
 
 
 55
 This case arose as a result of a fight between two inmates while working in the Mechanical Store at the Illinois State Penitentiary on November 20, 1968. One Bobby Bright, who weighs about 225 pounds, assaulted Gutierrez, the plaintiff, with a baseball bat. Gutierrez, who weighs only about 135 pounds, was severely injured.
 
 
 56
 Some two years earlier, on September 22, 1966, Bright hit another inmate on the head with a baseball bat; on November 11, 1967, Bright fought with inmate Grossman but was excused when the captains determined that Grossman was the aggressor; and on February 22, 1968, Bright was disciplined for striking inmate York.
 
 
 57
 Gutierrez filed his complaint in the federal court on July 20, 1970, naming the Warden and four other prison officials as defendants. He alleged that his civil rights were violated by defendants' failure to segregate Bright from the general prison population since the earlier assaults had made them aware of his violent propensities.
 
 
 58
 After Gutierrez moved for the appointment of counsel, the district judge designated Referee Schaefer as a special commissioner to investigate the relevant facts. The commissioner interviewed the parties, reviewed prison records, and concluded that the facts were essentially as alleged in the complaint, but that plaintiff's remedy, if any, was a negligence claim in the Illinois courts.
 
 
 59
 The district judge permitted various additional filings, but ultimately dismissed the complaint for the reasons suggested by the special commissioner. On appeal we appointed counsel for Gutierrez; he argues that the allegations in the complaint were sufficient to require an evidentiary hearing. The theory on which federal relief is sought is that cruel and unusual punishment[17] was inflicted upon Gutierrez as a result of the negligence of the prison officials. He seeks recovery of actual and punitive damages of $1,500,000.
 
 II.
 
 60
 On June 29, 1972, the Supreme Court held, unanimously, that parole revocation is a deprivation of liberty within the meaning of the Due Process Clause of the Fourteenth Amendment. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484.
 
 
 61
 That holding reversed a well-considered en banc opinion of the Eighth Circuit[18] which, as the Chief Justice noted, "was consistent with many other decisions on parole revocation." 408 U. S. at 475, 92 S.Ct. at 2597. Indeed, it is fair to state that the Eighth Circuit's opinion was in accord with a substantial body of law treating parole revocation as merely one application of "the principle that prison officials are vested with wide discretion in controlling persons committed to their custody." See 443 F.2d at 948.
 
 
 62
 The Morrissey holding, which is directly applicable only to parole revocations, is not dispositive of any of the cases before us. Nevertheless, we believe its unequivocal rejection of the line of cases on which the Eighth Circuit majority had relied makes it appropriate to reexamine the extent to which the wide discretion of prison officials remains unreviewable.
 
 
 63
 In Morrissey the Court squarely rejected the contention that since parolees remain in legal "custody" pursuant to criminal convictions, they have an insufficient interest in liberty to require any hearing prior to revocation. It is true that the Chief Justice carefully identified their interest in liberty as "conditional," 408 U.S. at 480, 484, 92 S.Ct. 2593, and stressed the significance of the parolee's life outside the prison walls. Id. at 481-482, 92 S.Ct. 2593. As we have noted, the holding of the case is therefore expressly limited to the subject of parole.
 
 
 64
 In view of the fact that physical confinement is merely one species of legal custody, we are persuaded that Morrissey actually portends a more basic conceptual holding: liberty protected by the due process clause may-indeed must to some extent-coexist with legal custody pursuant to conviction. The deprivation of liberty following an adjudication of guilt is partial, not total.[19] A residuum of constitutionally protected rights remains.
 
 
 65
 As we noted in Morales v. Schmidt, the view once held that an inmate is a mere slave is now totally rejected.[20] The restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical tradition that accords respect to the dignity and intrinsic worth of every individual.[21] "Liberty" and "custody" are not mutually exclusive concepts.
 
 
 66
 If the Morrissey decision is not narrowly limited by the distinction between physical confinement and conditional liberty to live at large in society,[22] it requires that due process precede any substantial deprivation of the liberty of persons in custody. We believe a due regard for the interests of the individual inmate, as well as the interests of that substantial segment of our total society represented by inmates,[23] requires that Morrissey be so read.
 
 
 67
 This does not mean, however, that every decision by prison officials should be subject to judicial review or that the courts rather than experienced administrators should write prison regulations. Morrissey reminds us that due process is a flexible concept which takes account of the importance of the interests at stake;[24] thus, it is abundantly clear that a myriad of problems of prison administration must remain beyond the scope of proper judicial concern.[25] Only significant deprivations of liberty raise constitutional issues under Morrissey. Moreover, in determining whether to require due process, we need not choose between the "full panoply" of rights accorded a defendant in a criminal prosecution, on the one hand, and no safeguards whatsoever, on the other. Rather, as Morrissey aptly illustrates, the requirements of due process may be shaped to fit the needs of a particular situation.
 
 III.
 
 68
 We turn now to the specific issues before us: The disallowance of statutory good time, punitive segregation, and the failure adequately to protect inmates from one another. As in Morrissey, our first task is to consider whether the consequences of the challenged actions of the state officials are sufficiently serious to amount to deprivations of liberty. If so, did the defendants afford these prisoners due process, or, in the case of Gutierrez, violate his Eighth Amendment rights?
 
 
 69
 A. Statutory Good Time.
 
 
 70
 Disparate appraisals of the significance of the revocation of good time credits are reflected in the Second Circuit's pre-Morrissey opinion in Rodriguez v. McGinnis,[26] on the one hand, and in the Task Force Report on Corrections, on the other.[27] We think the analysis in Morrissey points to the conclusion that the due process clause does apply to the revocation of good time credits.[28]
 
 
 71
 The time when an inmate may enjoy liberty is directly affected by the disallowance of statutory good time. In Green's case, for example, the discipline administered by the prison authorities will postpone the time of release for at least 21 months. The cancellation of such credits thus inflicts the same kind of "grievous loss" on the prisoner as does the revocation of parole. See 408 U.S. at 482, 92 S.Ct. 2593.[29]
 
 
 72
 Both the state and the inmate have an interest in the accuracy of the determination that the prisoner is in fact guilty of a serious rule infraction, and defendants have not identified any valid state interest in revoking good time credits without any procedural guarantees whatever. Like the parolee, an inmate who has accumulated statutory good time credits is entitled to rely on "at least an implicit promise" that they will be revoked only if he fails to live up to the prison rules.[30] In our judgment the determination whether such a failure has in fact occurred may not be made arbitrarily or capriciously. Cf. United States ex rel. Campbell v. Pate, 401 F.2d 55, 57 (7th Cir. 1968). Due process is required.
 
 
 73
 The procedural safeguards which plaintiffs demand are broader than those mandated by Morrissey for parole revocation hearings. The Court refused to write a code of procedure for such hearings. It did hold, however, that the minimum requirements of due process in such hearings include: "(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S. at 489, 92 S.Ct. at 2604.
 
 
 74
 Plainly, an in-prison disciplinary proceeding may be at least as informal as a parole revocation hearing. Thus, there is no absolute right to confront or to cross-examine witnesses; it is doubtful that counsel or a lay substitute is essential.[31] As a minimum, however, the prisoner must receive adequate advance written notice of the charges against him, he must be afforded a fair opportunity to explain his version of the incident, and, to insure a degree of impartiality, the factual determination must be made by a person or persons other than the officer who reported the infraction.
 
 
 75
 Accepting Green's allegations as true, which we must, these minimal requirements were not met before his good time credits were revoked. He did not receive any written notice of the several charges against him, it appears that officers who reported his violations participated in the recommendation that good time be revoked, and he was not given an opportunity to appear before the disciplinary committee which made the decisions. This is not due process.[32]
 
 
 76
 We do not think it appropriate for us to try to define the constitutional requirements with greater specificity at this time. Rather we defer in the first instance to the expertise of the state officials to specify the appropriate time and form of written notice for various offenses; the extent to which evidence must be disclosed;[33] the method for enabling a prisoner to explain or rebut the charges, including, if appropriate, an indication of the situations in which he may insist that witnesses be called or at least interviewed; and the extent to which a written statement of the disposition of the charge should be made. Unquestionably, if the Morrissey standards are met, due process will have been afforded; but until the rule-making process has been given an opportunity to develop more fully, we merely hold that the Constitution requires, as a bare minimum, advance written notice, a dignified hearing in which the accused may be heard, an opportunity to request that other witnesses be called or interviewed, and an impartial decision maker.
 
 
 77
 B. Punitive Segregation.
 
 
 78
 Serious rule infractions will frequently result in both removal from the general prison population and also the loss of good time credits. To the extent that the latter consequence is present, the foregoing discussion requires that the same safeguards apply to the decisional process. If the discipline does not directly or necessarily affect the timing of the prisoner's release from confinement, the Morrissey analysis of liberty does not apply. Arguably, therefore, in such instances the only restraint on the custodian's wide discretion to define the conditions of imprisonment is the limitation imposed by the Eighth Amendment; on that premise, the due process clause requires no procedural safeguards for purely internal prison disciplinary matters.
 
 
 79
 We have already impliedly rejected that extreme position by citing Sostre v. McGinnis[34] with approval. Adams v. Pate, 445 F.2d 105 (7th Cir. 1971). In that case, we stated that if a "prisoner is confronted with the accusation against him and afforded a reasonable opportunity to deny the accusation or explain his actions" before confinement in segregation, "this would appear to fairly and rationally satisfy the concept of procedural due process." Id. at 108. Since the decision of Morrissey, however, we have not had an opportunity to consider the application of that general requirement.
 
 
 80
 As the Chief Justice stated in Morrissey, the question whether any procedural precautions are due depends on the extent to which an individual will be condemned to suffer "grievous loss." 408 U.S. at 481, 92 S.Ct. 2593. Quite obviously not every adverse change in a prisoner's status, even assuming it impairs his residuum of liberty, is sufficiently "grievous" to amount to a constitutional deprivation. The consequences of conviction of crime involve not merely the loss of liberty enjoyable in a free society, but additionally the subsequent relatively minor impairments which are inevitably associated with membership in a closely supervised prison community. On the other hand, we are also convinced that additional punishment inflicted upon an inmate may be sufficiently severe, and may represent a sufficiently drastic change from the custodial status theretofore enjoyed, that it must be classified as "grievous loss."
 
 
 81
 The records before us describe a sufficient contrast between the privileges associated with membership in the general prison population and the severe restraints resulting from "segregation" to warrant the conclusion that prolonged segregated confinement is a "grievous loss." Nevertheless, it does not inevitably follow that procedural safeguards must apply whenever an inmate is removed from the general population. Before such a conclusion is justified in any given set of circumstances, there must be an identification of the precise nature of the government interest as well as the private interest affected. Cf. 408 U.S. at 481-483, 92 S.Ct. 2543.
 
 
 82
 As the facts of these cases demonstrate, there are various circumstances in which the state's interest in prompt, decisive action clearly outweighs an individual inmate's interest in procedural safeguards. Thus, as Gutierrez illustrates, it may be more desirable to frustrate a vicious attack by one inmate against another than to pause and assess responsibility for the dispute before taking action. And Armstrong and Krause remind us that the possibility of widespread violence is a continuous condition of prison life. A good faith determination that immediate action is necessary to forestall a riot outweighs the interest in accurate determination of individual culpability before taking precautionary steps. Indeed, even in many of the minor decisions that guards must make as problems suddenly confront them in their daily routines, the state's interest in maintaining disciplined order outweighs the individual's interest in perfect justice. Cf. Hagopian v. Knowlton, 470 F.2d 201, 210-211 (2d Cir. 1972). Some mistakes and some arbitrary conduct are inevitable incidents of effective management of a large group of confined human beings.
 
 
 83
 In cases involving major rule infractions for which the punishment is severe, after the immediate crisis is past, the relative importance of the inmate's interest in a fair evaluation of the facts increases and the state's interest in summary disposition lessens; indeed, in such cases, in the long run the state's interest in a just result is the same as the individual's. For in those cases neither the state nor the inmate has any valid interest in treating the innocent as though he were guilty.
 
 
 84
 We therefore conclude that Judge Bauer and Judge Doyle both correctly held that the due process clause applies to the in-prison disciplinary proceedings which Armstrong and Krause respectively challenged.[35] In the light of Morrissey, however, we are persuaded that the relief ordered in both cases should be modified. Judge Doyle ordered greater procedural safeguards for an in-prison disciplinary proceeding than Morrissey requires in a parole revocation hearing. His order rested on the assumption that nothing less than the safeguards identified in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, could constitute due process. Morrissey, since it squarely holds that confrontation is not essential in every case, makes it clear that the clause has greater flexibility. Since we find a lesser interest in liberty and a greater state interest in summary disposition of in-prison disciplinary cases than of parole revocation matters, we believe Morrissey describes the maximum procedural safeguards required by the application of the due process clause to an in-prison proceeding.[36] In any case which may involve "grievous loss," we believe the bare minimum is that applicable to a proceeding which may result in the revocation of statutory good time, namely, an adequate and timely written notice of the charge, a fair opportunity to explain and to request that witnesses be called or interviewed, and an impartial decision maker. Since these minima go beyond the dicta in Adams v. Pate, and the relief required by Judge Bauer, and since Judge Doyle's preliminary injunction exceeds not only these minima but Morrissey as well, the relief granted in both cases must be modified.
 
 
 85
 Instead of attempting in this opinion to fashion the precise relief which is appropriate, we believe both district courts should hold hearings dealing solely with the matter of relief. And before those hearings are held, we believe the respective defendants should have an adequate opportunity to prepare the kind of procedural regulations which they consider appropriate in the light of this opinion.[37] Among other issues to be faced squarely in the first instance by the defendants, and then reviewed by the district judges, is precisely what measure of punishment is sufficiently severe to bring the due process requirement into play. Stated conversely, what are the limits of the area in which the state's interest in unreviewable disciplinary discretion outweighs the individual's interest in fair procedures? And for those situations in which due process is required, they must also determine the extent to which the minimum standards identified in this opinion need to be supplemented or clarified.
 
 
 86
 The judiciary cannot avoid its ultimate responsibility for interpreting the constitutional requirements of due process. Certainly that responsibility cannot be delegated to prison authorities. But neither should their expertise nor their assistance in accurately identifying and evaluating the interests at stake be ignored. These cases represent a stage in the development of an extremely important phase of constitutional law. It is appropriate that the development proceed with full deliberation. See Sostre v. McGinnis, 442 F.2d 178, 197 (2d Cir. 1971). We therefore set aside the decrees in both cases and remand for further proceedings on the question of relief.[38]
 
 
 87
 C. Gutierrez's Eighth Amendment Claim.
 
 
 88
 There is no question about the fact that Gutierrez was severely injured by Bobby Bright, a fellow inmate, but it is equally clear that he has not alleged a federal claim against Bright. It is not contended that Bright was acting under color of state law, either because he was carrying out a specific order of a correction officer or because he had been granted certain authority which enabled him to harm the plaintiff. Bright was not a "trusty" authorized to supervise fellow inmates. Cf. Roberts v. Williams, 456 F.2d 819 (5th Cir. 1971). The assault committed by Bright was a common law tort; he did not violate Sec. 1983.
 
 
 89
 The theory of Gutierrez's claim against the defendant prison officials is that they are responsible for subjecting him to cruel and unusual punishment in violation of his Eighth Amendment rights because they did not prevent the assault from taking place.[39] Gutierrez claims that defendants Riley and Kennedy were negligent in their supervision of the Mechanical Store where the assault occurred and that defendants Pate, Pollmann and Shifflet were negligent in not segregating Bright from the general prison population. The claims against the two groups of defendant officers are thus somewhat different, although both are predicated on the Eighth Amendment.
 
 
 90
 That amendment may be violated either by the intentional infliction of punishment which is cruel[40] or by such callous indifference to the predictable consequences of substandard prison conditions that an official intent to inflict unwarranted harm may be inferred.[41] In the former instance, the issue is whether the punishment inflicted is "cruel and unusual"; in the latter, the issue is whether the harm suffered (assault with a baseball bat) is "punishment" within the meaning of the Eighth Amendment. Quite clearly the allegation that defendants Riley and Kennedy were negligent in their supervision of the Mechanical Store on one occasion is insufficient to establish that they inflicted "punishment" on Gutierrez.
 
 
 91
 The charges against the warden and the disciplinary officers are more serious because they include criticism of various aspects of prison administration.[42] Insofar as they relate to the particular assault by Bright, however, they involve only the failure to segregate him from the general prison population. It is alleged that both Bright's prior history and his general reputation among inmates put defendants on notice of the risk that he might engage in acts of violence.
 
 
 92
 *****
 
 
 93
 * * *
 
 
 94
 *****
 
 
 95
 * * *
 
 
 96
 We, of course, accept these allegations as true not only because Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652, requires us to do so, but also because an examination of the record (which includes Bright's disciplinary history, affidavits and a report by the Referee who visited the prison) corroborates their essential accuracy. The legal question which is presented is whether the acceptance of the foreseeable risks of violence which are involved in a decision to permit a potentially dangerous inmate to associate with the general population subjects a correction officer to Sec. 1983 liability when such violence actually ensues. More narrowly, the issue is whether the allegations are sufficient to require the defendants to prove their good faith in an evidentiary hearing. Cf. Wheeler v. Glass, 473 F.2d 983, 985 (7th Cir. 1973).
 
 
 97
 Though the analogy is not decisive of this case, we note that plaintiff's theory, if valid, might require parole boards to defend their exercise of discretion when the ever-present risk of recidivism materializes and a parolee commits a foreseeable attack on another citizen.[43] Even if the defense of good faith is adequate to defeat such claims, the introduction of judicial review would inevitably inhibit the exercise of discretion.
 
 
 98
 Within the prison itself the warden and his agents must also be permitted a wide area of unreviewable discretion. The proper placement or classification of the especially dangerous inmate should not present him with a Hobson's choice between alternative Eighth Amendment claims; segregation on the basis of mere suspicion or inadequate history of violence might have subjected him to a claim by Bright, whereas the failure to segregate has given rise to a claim by Gutierrez. In this case, plaintiff has alleged that an erroneous decision was made; even assuming that error is attributable to negligence, in our opinion that allegation is insufficient to describe a violation of the Eighth Amendment. Even under the broad standard enunciated in Haines v. Kerner, it appears beyond doubt that plaintiff cannot recover damages under Sec. 1983.
 
 
 99
 The order dismissing Gutierrez's complaint is affirmed. The orders dismissing the complaints filed by Miller, Green and Thomas are reversed. The injunctive orders entered in Armstrong and Krause are vacated without prejudice to the entry of appropriately fashioned decrees on remand. In all appeals except Gutierrez, the cases are remanded for consideration of Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), and such further proceedings consistent with this opinion as may be appropriate.[44]
 
 
 100
 SWYGERT, Chief Judge (dissenting in part).
 
 
 101
 With due deference to the thoughtful and persuasive views developed by Judge Stevens, I find myself unable fully to embrace the majority opinion. In Gutierrez the eighth amendment has been too narrowly construed and the issue has, I submit, been incorrectly posed; in the remaining cases I am unable to perceive the basis upon which Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2543, 33 L.Ed.2d 484 (1972), has been limited.
 
 
 102
 Morrissey stands for the proposition that the "conditional" liberty of parole may not be revoked except after a hearing attended by a number of procedural safeguards long thought essential to insure due process of law, albeit fewer in number than the full panoply of rights accorded a criminal defendant at his trial. To the extent that the deprivation of liberty suffered by a parolee upon his return to prison may be analogized to the deprivations felt by the prisoners in the cases before us, Morrissey, along with all of its enumerated protections, is applicable and binding upon us. The majority, for reasons which are not entirely clear to me, has diluted Morrissey: of the six procedural due process requirements set down by that case, only three are positively required when statutory good time is revoked or when segregation is imposed.[1] I do not favor this piecemeal approach, particularly where good time is revoked.
 
 
 103
 Good time credits accumulated by a convict serving time in an Illinois or Wisconsin prison reduce the maximum sentence he must serve and shorten the term of confinement required by those States as a prerequisite to his eligibility for parole. In the event that a prisoner serves the maximum period of incarceration to which he has been sentenced, the revocation of accrued good time credit does more than affect a "conditional" liberty; it makes the difference between full incarceration and the enjoyment of liberty conferred upon free men. When the denial of good time serves only to lengthen the period before which a convict is considered for parole, that denial clearly affects the possibility, if not the grant, of his "conditional" liberty. The majority seems to agree, stating: "[t]he cancellation of . . . [good time] credits . . . inflicts the same kind of 'grievous loss' on the prisoner as does the revocation of parole". Inexplicably, however, my colleagues afford convicts facing a loss of good time fewer procedural protections than Morrissey confers upon those confronted with a revocation of parole.
 
 
 104
 The majority likewise requires only a partial adherence to the standards of Morrissey when it deals with punishment by prolonged segregated confinement, despite its concession that segregation, when viewed in contrast with the relative freedom enjoyed by members of the general prison population, is sufficiently harsh to constitute a "grievous loss" of liberty. No argument is advanced that the quantum of liberty separating imprisonment from the "conditional" freedom of parole is appreciably greater than the measure of liberty dividing punitive segregation from normal incarceration.[2] We are told, instead, that the state holds a greater interest in the summary disposition of in-prison disciplinary cases than of parole revocation matters. I am unable to agree. The state has a legitimate interest in expedited discipline only when procedure by hearing raises a risk of danger to inmates or to the prison institution as a whole by widespread violence or riot. This was recognized even in Morrissey:
 
 
 105
 [T]he State has no interest in revoking parole without some informal procedural guarantees. Although the parolee is often formally described as being "in custody," the argument cannot even be made here that summary treatment is necessary as it may be with respect to controlling a large group of potentially disruptive prisoners in actual custody. 408 U.S. at 483, 92 S.Ct. at 2601. (emphasis supplied).
 
 
 106
 When the threat of violence has passed, and suspected troublemakers have been neutralized by segregation or other means, the state can point to no interest in summary disposition of their cases greater than the interest it would have in summarily returning them to prison were they parole violators in state custody. For this reason, I view Morrissey as applying with full force whenever prison officials seek long term segregation for one in their charge.
 
 
 107
 The reluctance of the majority to give full sway to Morrissey may perhaps be explained by an understandable reticence to move hastily in an area of major but developing constitutional significance. Judge Stevens writes:
 
 
 108
 The judiciary cannot avoid its ultimate responsibility for interpreting the constitutional requirements of due process. Certainly that responsibility cannot be delegated to prison authorities. But neither should their expertise nor their assistance in accurately identifying and evaluating the interests at stake be ignored. These cases represent a stage in the development of an extremely important phase of constitutional law. It is appropriate that the development proceed with full deliberation.
 
 
 109
 Thus, Armstrong and Krause are remanded for hearings on relief, and the district courts directed to pay special heed to determining, where due process is required, "the extent to which the minimum standards identified in . . . [the majority] opinion need to be supplemented or clarified." (emphasis added). I would be unable to countenance this disposition even if I fully agreed with my colleagues on the other aspects of these cases. Such an approach, I submit, reflects an overabundance of caution, one which I suspect will return to haunt us. The district courts, on remand, will be free to accept or reject additions to the "minimum" Morrissey safeguards endorsed by the majority. Whichever they choose, perhaps inconsistently, to do, I entertain no doubt that the dissatisfied party will again take an appeal to this court, presenting us with the hard questions we have presently declined to answer. The correctional authorities of both Illinois and Wisconsin had ample opportunity in Krause and Armstrong to present their cases for limited disciplinary hearings; I doubt that the breathing space left by the majority will enable these authorities appreciably to amplify their contentions.
 
 
 110
 I turn finally to Gutierrez. As posed by the majority, the central issue of Gutierrez' appeal reads as follows:
 
 
 111
 The legal question which is presented is whether the acceptance of the foreseeable risks of violence which are involved in a decision to permit a potentially dangerous inmate to associate with the general population subjects a correction officer to Sec. 1983 liability when such violence actually ensues.
 
 
 112
 With respect for their views, I submit that the majority has mistaken the issue. Bobby Bright was not simply permitted to "associate with the general [prison] population"; he was assigned, along with Gutierrez and other inmates, to the Mechanical Store, described by Warden Twomey as "a small assignment . . . where the institutional supplies are kept."[3] But there is more to the matter. Another prison employee adds significant detail to this bland portrayal in describing the assault on Gutierrez:
 
 
 113
 The baseball bat [with which Gutierrez was hit] was part of the playground equipment as, at that time, the Mechanical Store had a recreation area adjacent to the Mechanical Store, and the recreation equipment, including baseball bats, was kept on the Mechanical Store assignment. Many other items such as ax and sledge hammer handles, iron pipe, pieces of steel, etc., were also kept in the Mechanical Store, and any of these could have been used as a weapon if an inmate wanted to make an attack on another person.[4]
 
 
 114
 By the State's own affidavits, then, a man whom the majority admits should have been viewed as aggressive and dangerous by prison authorities was allowed substantially unguarded[5] access to numerous weapons while in the presence of other inmates.
 
 
 115
 Simple negligence may not comprise "punishment" within the meaning of the eighth amendment, but I cannot accept the view that all actions or omissions not undertaken intentionally are also excluded from that definition. Negligence may rise to gross negligence and then to recklessness before scienter enters the realm of intent. If a prison official recklessly allows or promotes the continuance of a situation which, more likely than not, threatens physical danger to inmates in his charge from some other inmate, any injury proximately caused by that recklessness is cruel and unusual punishment and actionable under 42 U. S.C. Sec. 1983. A prisoner does not share the option given to a free man to run from and avoid those who threaten him. When assigned to a detail-the Mechanical Store, for example-he runs the risk of punishment if he fails to appear for or refuses duty. And when the state, having deprived him of his freedom of movement, recklessly provides a potential attacker with access to dangerous weapons, it should not and must not be allowed to disclaim responsibility for a resulting incident. See Roberts v. Williams, 456 F.2d 819 (5th Cir. 1971); Holt v. Sarver, 309 F.Supp. 362 (E.D. Ark.1970). As the Fifth Circuit said in Roberts:
 
 
 116
 We see . . . cruelty in the sustained maintenance, over a period of time of a needlessly hazardous condition for plaintiff and other prisoners. We might say careless preparation of a single meal, producing food poisoning in prisoners, was not cruel, but it might be so if the jailors negligently allowed the jail's only drinking water supply to become permanently infected with typhoid bacteria. The word punishment, too, implies a wrong in prison management, in contrast to the casual dereliction of a minor prison employee. Thus in an Eighth Amendment case, if there were, as here, no conscious purpose to inflict suffering, we would look next for a callous indifference to it at the management level, in the sustained knowing maintenance of bad practices and customs. When prison wardens are cruel in their attitudes, negligent as well as intended injuries result. 456 F.2d at 827.
 
 
 117
 The district court sought support for its dismissal in United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970), Beishir v. Schanzmeyer, 315 F. Supp. 519 (W.D.Mo.1969), and Gittlemacker v. Pennsylvania, 281 F.Supp. 175 (E.D.Pa.1968). It erred in so doing. These cases are not apposite, the plaintiff in each having alleged no more than simple negligence on the part of prison officials.[6] Given the record as it stands, along with the admonition of Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), I would reverse the dismissal as to all individual defendants other than Bright and remand for a trial. Cf. Puckett v. Cox, 456 F.2d 233 (6th Cir. 1972).
 
 
 
 [1]
 108 Ill.Rev.Stats. Sec. 45; Illinois Department of Public Safety, Rules Relating to Parole and Pardons 51-54 (1962). See also Wis.Stats. Sec. 53.11 (1969)
 
 
 [2]
 For an explanation of the difference between the "minimum parole date" and the "statutory release date" as those terms are used in New York, see McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973)
 
 
 [3]
 The order of July 22, 1971, provided:
 "Plaintiff's 'Petition for Declaratory Judgment,' treated as an action under 42 U.S.C. Sec. 1983, dismissed as frivolous. 28 U.S.C. Sec. 1915(d). It is not for the federal courts to review or regulate the reasonable disciplinary procedures of state penal institutions. See Cole v. Smith, 344 F.2d 721 (8th Cir. 1965); United States ex rel. Atterbury v. Ragen, 237 F.2d 953 (7th Cir. 1956), cert. denied, 353 U.S. 964, 77 S.Ct. 1049, 1 L.Ed.2d 914."
 
 
 [4]
 The three were named as defendants and identified in the complaint as "Captains Morris, Pollmann and Shifflet, Stateville Branch."
 
 
 [5]
 Affidavit of John J. Twomey, page 1. The Warden instituted procedural changes in 1970, which are not under review in these cases. The Warden's affidavit stated:
 "Since November 1970, I instituted a policy that before a prisoner's Statutory Good Time could be revoked or he would be demoted in grade, he is to be heard by the Merit Staff, which is composed of two (2) captains, two (2) assistant wardens, and one (1) representative of the Record Office. He is given the privilege of defending himself against the charge, and after his testimony, the Merit Staff then renders a decision in the case. If they recommend that Statutory Good Time be revoked, the report is sent to me for my approval, and if I approve the action taken by the Merit Staff, the report is signed by each member of the Merit Staff and myself, and then mailed to the Director of the Department of Corrections, who has the final approval for the revocation of Statutory Good Time.
 "The Merit Staff makes every honest attempt to review all the evidence of the alleged violation, and they do not take any action until they are completely sure that the prisoner is guilty of the charge.
 "I am requesting that the Merit Staff at the Joliet Branch, where Green is confined, review his loss of Statutory Good Time because at the time of his revocation, prisoners were not heard by the Merit Staff."
 The request in the last paragraph does not moot this case since the record does not show that Green's good time has been restored. Furthermore, there is nothing in the record to indicate that the requested Merit Staff review will cure the procedural defects alleged.
 
 
 [6]
 The statement apparently described the manner in which the following rule was applied:
 "In case any convict who may become entitled to any diminution of his sentence by the provisions aforesaid shall be guilty of violating the prison rules of misconduct, or a violation of law of the State, he may for the first offense forfeit two days; for the second offense, four days; for the third offense, eight days; for the fourth offense, sixteen days; and in addition thereto, whatever number of days, more than one, that he is in punishment, may be forfeited. For more than four offenses, the Director of the Department of Corrections, upon the recommendation of the Warden of the Division of the Penitentiary in which the convict is imprisoned, shall have the power, at his discretion, to deprive such convict of any portion or all of the good time that the convict may have earned, or may earn in the future." (Emphasis added.)
 Department of Corrections, Rules and Statutes Relating to Parole and Pardons (1962), page 54.
 
 
 [7]
 The date, offenes, and discipline imposed on those four occasions were:
 Date Offense Disposition
-------- -------------------------------------------- -----------------------
10/9/65 Cursing an officer and using vulgar language
 to an officer. 7 days Isolation.
12/29/65 Smoking in bed. Denied two shows 1/8
 and 1/15/66
2/9/65 Hiding three pints of contraband ice cream
 on his assignment. Isolated five days.
2/17/66 Writing stories of an obscene nature and
 passing them to other inmates. Denied 30 days
 earphones.
 
 
 [8]
 The subsequent offenses which resulted in the loss of good time are described in the affidavit of A. J. Pollmann, a Disciplinary Captain:
 "Andrew Green has been a disciplinary problem since his incarceration. On May 4, 1966, he was demoted from 'A' to 'C' Grade for forging another inmate's name to a commissary slip. On March 7, 1967 he lost six months Good Time for a violation as outlined in my affidavit. On April 24, 1967, six months Statutory Good Time was revoked for calling Officers obscene names. On July 21, 1967, he was demoted from 'B' to 'C' Grade, and on July 21, 1967, three months Statutory Good Time was revoked for setting fire to his mattress and creating a disturbance in Segregation. On February 3, 1969, three months Statutory Good Time was revoked for threatening an Officer, and he was also demoted from 'B' to 'C' Grade. On January 7, 1970, he was retained in 'C' Grade for one year. On January 30, 1970, three months Statutory Good Time was revoked from the maximum of his sentence. At no time was his Statutory Good Time revoked because he was filing lawsuits against the institution but because of his disregard for institutional rules." (Pages 3-4.)
 
 
 [9]
 "Plaintiff attacks this system (which has been voluntarily altered in some respects in late 1970) on several grounds: there are no standards to guide the action of the disciplinary captain; the inmate could not as a matter of right call witnesses or cross examine the guards who reported the violations; he did not have counsel or an adequate substitute; no record was made for review; and that the inmate does not appear before the merit staff. A similar claim has been considered and rejected in a scholarly opinion in Sostre v. McGinnis, [442 F.2d 178 (2d Cir. 1971)]. There the court held that the Constitution required only that the facts be rationally determined, including in most cases the opportunity of the inmate to confront his accuser and be informed of the evidence against him, and he be afforded a reasonable opportunity to explain his actions. If these measures are followed, an adequate balance between the needs of the orderly administration of the institution and the rights of the prisoner will result. The Constitution requires no more. Thus, the complaint does not state a claim for the deprivation of plaintiff's federally guaranteed rights; nor did the revocation of his good time, considering his 175 [sic] violations. Uryga v. Ragen, 181 F.2d 660 (7th [Cir.] 1950)." Memorandum of Judge Napoli dated June 7, 1971, pages 7-8
 
 
 [10]
 Disciplinary Captain Pollmann's affidavit states that Thomas admitted that he gave the letter to an officer to be mailed outside of the institution and that he received a $15 moneyorder from the exinmate who was using Thomas's sister's return address
 
 
 [11]
 In his opinion the court stated:
 "I reject the holding in [Sostre v. Rockefeller, 312 F.Supp. 863 (1970)] as not being the proper and applicable law. Prison officials may maintain internal order and security by the use of programs of 'isolation' and 'segregation confinement' without in doing so violating the Fourteenth Amendment to the Constitution of the United States, as long as in doing so they do not act so arbitrarily or so prejudicially that their conduct offends those basic principles of fairness and justice so rooted in our American system as to be ranked as fundamental. Walker v. Pate, 356 F.2d 502, cert. denied, 384 U.S. 966, 86 S.Ct. 1598, 16 L.Ed.2d 678."
 
 
 [12]
 In his affidavit in the Thomas case, Disciplinary Captain Pollmann stated:
 "Since the 1st of December, 1970, the disciplinary procedure of placing an inmate in Isolation has been changed. Now the Disciplinary Captain, one Line Officer, and one member of the Clinical Staff meet and decide the guilt of the inmate and fix the disciplinary action in accordance with the seriousness of the violation. No inmate is placed in Isolation until he is heard by this committee. The inmate is given the opportunity of giving his side of the violation to the committee if he cares to do so, and is given every opportunity to defend himself before the committee."
 See also note 5, supra.
 
 
 [13]
 Memorandum Opinion and Order of Judge Bauer dated June 13, 1972, pages 2-5
 
 
 [14]
 "This Court is of the opinion that the Special Program Unit, while constituting a commendable attempt to deal with potentially disruptive prisoners, is not a therapeutic unit. Essentially, it is a form of punishment, penalizing those inmates whose past prison conduct has demonstrated that they may be security risks
 "It is not disputed that the Special Program Unit, in terms of inmate treatment, occupies a position midway between the general prison population and isolation. Nonetheless, the unit still segregates inmates for past infractions of prison rules. Once an inmate is placed in the Unit, the privileges he was entitled to receive while in the general prison population are drastically curtailed. While in the Unit, inmates have no cell partners, are fed in their cells, have only one hour of 'yard privileges' per week, and must be escorted by lead chains to visits and hospital treatments.[4] Therefore, for purposes of determining whether plaintiffs have been confined without necessary procedural safeguards, this Court will view their confinement as a form of punishment."
 Footnote 4 stated:
 "This is in sharp contrast to the general prison population, wherein inmates can work at various job locations within the prison, receive approximately two hours of exercise per day, no chains are used during visits or hospital treatments, and have cell partners."
 
 
 [15]
 Id. at 9-10
 
 
 [16]
 Id. at 11
 
 
 [17]
 The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (Emphasis added.)
 
 
 [18]
 Morrissey v. Brewer, 443 F.2d 942 (1971)
 
 
 [19]
 See Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356; Coffin v. Richard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001. See also the authorities cited in Morales v. Schmidt (7th Cir. 1973) (slip opinion at 12, and dissenting opinion at 18 n. 9)
 
 
 [20]
 Compare Morales v. Schmidt (7th Cir. 1973) (slip opinion at 4 n. 2), quoting Ruffin v. Commonwealth, 62 Va. (21 Gratt.) 790 (1871), with Morales v. Schmidt (slip opinion at 12), quoting Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263. Cf. Furman v. Georgia, 408 U.S. 238, 272-273, 92 S.Ct. 2726, 2743, 33 L.Ed.2d 346 (Brennan, J., concurring): "The true significance of these punishments is that they treat members of the human race as nonhumans, as objects to be toyed with and discarded. They are thus inconsistent with the fundamental premise of the [Cruel and Unusual Punishment] Clause that even the vilest criminal remains a human being possessed of common human dignity."
 
 
 [21]
 In his dissenting opinion in Morrissey v. Brewer, Circuit Judge Lay quoted the following excerpt from the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 83 (1967) (hereinafter cited as Task Force Report):
 "A first tenet of our governmental, religious, and ethical tradition is the intrinsic worth of every individual, no matter how degenerate. It is a radical departure from that tradition to subject a defined class of persons, even criminals, to a regime in which their right to liberty is determined by officials wholly unaccountable in the exercise of their power. . . ." 443 F.2d at 952 n. 1.
 
 
 [22]
 See Task Force Report at 6-12. See especially the discussion of "Blurring Lines Between Institution and Community" at 10-11
 
 
 [23]
 "A substantial portion of our population is affected by the law in this area. Approximately 1.3 million people are at any one time subject to correctional authority; untold millions have criminal records. There is increasing doubt as to the propriety of treating this large group of persons as, in varying degrees, outcasts from society. And there is increasing recognition that such treatment is not in the ultimate interests of society. Denying offenders any chance to challenge arbitrary assertions of power by correctional officials, and barring them from legitimate opportunities such as employment, are inconsistent with the correctional goal of rehabilitation, which emphasizes the need to instill respect for and willingness to cooperate with society and to help the offender assume the role of a normal citizen." Task Force Report at 82
 
 
 [24]
 See also Hagopion v. Knowlton, 470 F.2d 201, 207-209 (2d Cir. 1972)
 
 
 [25]
 "Enormous discretion is left to correctional administrators to define the conditions of imprisonment. They determine the way in which the offender will live for the term of imprisonment; how he is fed and clothed; whether he sleeps in a cell or a dormitory; whether he spends his days locked up or in relative freedom; what opportunity he has for work, education, or recreation. They regulate his access to the outside world by defining mailing and visiting privileges. They define rules of conduct and the penalties for violation of such rules. And increasingly, they make classification decisions-assigning different prisoners to different kinds of correctional programs. This may involve decisions to place prisoners in different institutions or to grant certain prisoners relative freedom in the community, as for example on educational or work-release programs." Task Force Report at 84
 
 
 [26]
 "The issue in this case is typical of the increasing number of trivial questions of internal prison discipline now being brought, in the first instance, before the federal courts. If the results were not so serious for the administration of justice through state and federal procedures, the spectacle of a federal court of appeals solemnly deciding on the penalty in terms of good time a state prisoner should receive for having dirty pictures in his cell (or for refusing to be a tattle tale) would be so absurd as to be laughable. But if this court entertains actions of this kind it will encourage state prisoners who have any kind of 'beef' to bring such actions and the federal courts will end up sitting as prison boards of discipline in the state prisons
 "The federal courts should refuse to interfere with internal state prison administration except in the most extreme cases involving a shocking deprivation of fundamental rights. * * * A case such as the instant one, which is totally devoid of merit, should be dismissed out of hand." 451 F.2d 730, 732 (2d Cir. 1971), rev'd en banc, 456 F.2d 79 (1972), rev'd sub nom., Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).
 
 
 [27]
 "Decisions regarding the withholding or forfeiture of good time credit generally differ from the parole decision in that they turn solely on the offender's behavior during his period of imprisonment: Good behavior entitles him to early release regardless of anyone's judgment as to his potential for living a law-abiding life in the community. He should therefore have an opportunity to challenge charges of misconduct. Where such charges may lead to a substantial loss of good time and a resultant increase in the actual length of imprisonment, the prisoner should be given reasonable notice of the charges, full opportunity to present evidence and to confront and cross-examine opposing witnesses, and the right to representation by counsel." Task Force Report at 86
 
 
 [28]
 In these cases, we consider the revocation of accumulated good time credits in systems where prisoners who conform to prison regulations receive good time as a matter of right. No party has argued that there is a difference between withholding and revoking good time. But cf. Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971). This is probably explained by the fact that under the Illinois and Wisconsin rules, good time can be withheld or revoked only for misconduct; thus, in these cases, the distinction has no practical significance. We note, however, that the Supreme Court recognizes such a distinction under the New York rules considered in McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). Under such rules, the grant of good time credit is an exercise of discretion arguably comparable to the grant of parole. See Id. at note 1. In New York, a prisoner "may receive [good time credit] for good conduct and efficient and willing performance of duties assigned, . . . but nothing herein contained shall be construed to confer any right whatsoever upon any prisoner to demand . . . such reduction." New York Correction Law Sec. 230(2), McKinney's Consol.Laws, c. 43. Of course, once good time has been granted, its revocation for misconduct would raise issues identical to those we treat in this opinion. In any event, whether and, if so, what due process is necessary under the New York system is not presented by these cases. The discretionary aspects of the New York system are in sharp contrast to those before us. The Wisconsin statute provides:
 "Credit for good conduct; forfeiture for bad; parole. (1) The warden or superintendent shall keep a record of the conduct of each inmate, specifying each infraction of the rules. Each inmate who shall conduct himself in a proper manner and perform all the duties required of him shall be entitled to good time or diminution of sentence according to the following table, prorated for any part of a year: First year, one month; second year, 2 months; third year, 3 months; fourth year, 4 months; fifth year, 5 months; every year thereafter, 6 months.
 "(2) Any inmate who violates any regulation of the prison or refuses or neglects to perform the duties required of him shall be subject to forfeiture of any good time previously granted or earned under this chapter, 5 days for the first offense, 10 days for the second offense and 20 days for the third or each subsequent offense. Good time so forfeited shall not be restored. In addition, the department, or the warden or the superintendent, with the approval of the department, may cancel all or part of such good time." Wis.Stats. Sec. 53.11 (1969).
 
 
 [29]
 Cf. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530. In ruling that misdemeanor defendants facing possible jail sentences are entitled to counsel, the Supreme Court recognized that imprisonment for even one day has a substantial impact on a man's liberty
 
 
 [30]
 Cf. 408 U.S. at 482, 92 S.Ct. at 2601: "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases the parolee faces lengthy incarceration if his parole is revoked."
 The Court also rejected the "right-privilege" distinction: "It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal." Ibid.
 
 
 [31]
 There are two reasons why this is a doubtful point, neither of which involves any disagreement by this court with our prior holding in Gunsolus v. Gagnon, 454 F.2d 416 (7th Cir. 1971), cert. granted sub nom., Gagnon v. Scarpelli, 408 U.S. 921, 92 S.Ct. 2490, 33 L.Ed.2d 331. The first, of course, is our disagreement with the proposition that whatever procedural safeguards are required for a parole (or probation) revocation hearing are also necessarily applicable to an in-prison disciplinary hearing. The second is the doubt inspired by the fact that the opinion of the Supreme Court in Morrissey did not endorse the reference to the counsel question in the separate opinion of Mr. Justice Douglas. See 408 U.S. at 498, 92 S.Ct. 2543
 
 
 [32]
 Likewise, Miller and Thomas have stated causes of action in their complaints
 
 
 [33]
 We are conscious of the fact that one of the minimum procedural requirements in a parole revocation hearing is "disclosure to the parolee of evidence against him." 408 U.S. at 489, 92 S.Ct. at 2604. Whether that language is read to require disclosure of "all evidence" or merely "some evidence," it does not necessarily follow that the same amount of disclosure is appropriate for evidence relating to conduct outside of the prison walls as for evidence relating to misconduct within the prison. Disclosure of the latter type of evidence might sometimes create hazards for informers and the preservation of order that are not present in the former situation. Of course, fairness may nevertheless require disclosure of the evidence on which the impartial decision maker relies. At this point we simply hold that the precise question has not yet been determined by Morrissey and should be explored further on remand before it is finally decided
 
 
 [34]
 In Sostre the Second Circuit expressed agreement with "the judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined." 442 F.2d 178, 198 (2d Cir. 1971)
 
 
 [35]
 See Gray v. Creamer, 465 F.2d 179, and cases cited at page 185 (3rd Cir. 1972)
 
 
 [36]
 We note that Morrissey did not determine whether due process requires counsel or counsel substitute at parole revocation or, analogously, probation revocation hearings. See Gunsolus v. Gagnon, 454 F.2d 416 (7th Cir. 1971), cert. granted sub nom., Gagnon v. Scarpelli, 408 U.S. 921, 92 S.Ct. 2490, 33 L.Ed.2d 331 (1972). If the Supreme Court reverses this circuit's ruling in Gunsolus that a person on probation is entitled to the assistance of counsel, it would follow that the Morrissey "maximum procedural safeguards" would not include the right to counsel
 
 
 [37]
 Cf. Clutchette v. Procunier, 328 F.Supp. 767, 785 (N.D.Cal.1971). Of course, hearings on relief would be unnecessary (a) if the Supreme Court had held in Morrissey that the procedural requirements for parole revocation are also applicable to in-prison disciplinary matters; or (b) if the parties had already debated the relief issues in full. With respect to (a), the Supreme Court painstakingly avoided any such holdings and again reminded us "that not all situations calling for procedural safeguards call for the same kind of procedure." 408 U.S. at 481, 92 S.Ct. at 2600. With respect to (b), adequate hearings were not held in any of these cases. Judges Napoli, Hoffman and Parsons all sustained motions to dismiss. Judge Doyle erroneously assumed that all situations calling for some procedural safeguards required at the very least those outlined in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 33 L.Ed.2d 287. The issue before Judge Bauer turned on his interpretation of Walker v. Pate, 356 F.2d 502 (7th Cir. 1966), since Morrissey had not yet been decided when he faced the problem of relief. It is, of course, quite true that hard questions will remain for decision; it is also true that in the end we may simply transplant the Morrissey requirements. But "when reliable, detailed information or empirical studies are as scanty as they are on the subject of prison disciplinary procedures," we choose to follow Learned Hand's wise counsel against hasty decision in the area of constitutional adjudication. See Sostre v. McGinnis, 442 F.2d 178, 197 (2d Cir. 1971)
 
 
 [38]
 In Armstrong, plaintiffs also contend that the district court erred in not awarding damages. On this point, we affirm. We believe that the defense of good faith is available to prison officials, as it is to police officers. See Pierson v. Ray, 386 U.S. 547, 555-558, 87 S.Ct. 1213, 18 L.Ed.2d 288. Cf. Briscoe v. Kusper, 435 F.2d 1046, 1057-1058 (7th Cir. 1970); McLaughlin v. Tilendis, 398 F.2d 287, 290-291 (7th Cir. 1968). The record confirms that defendants' good faith defense is meritorious. They performed their duties faithfully; and, since this opinion imposes a previously unannounced standard of conduct, it is manifestly inappropriate to require them to answer in damages
 
 
 [39]
 "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const.Amend. VIII
 
 
 [40]
 See Furman v. Georgia, 408 U.S. 238, 271-274, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Brennan, J., concurring)
 
 
 [41]
 See Roberts v. Williams, 456 F.2d 819, 827 (5th Cir. 1971); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970)
 
 
 [42]
 Gutierrez submitted his complaint on July 10, 1970. He was interviewed by Referee Schaefer on October 23, 1970. On December 21, 1970, Gutierrez, in his answer to the state's motion to dismiss, made several serious allegations for the first time:
 "The Prison records will show (that is if these records have not 'mysteriously vanished?') that Bobby Brieht [sic] has attacked other inmates with baseball bats, and was not placed in 'macimum' [sic] confinement as is [sic] OUR BLACK BROTHERS who ARE, yet they do not commit cowardly acts with weapons on their fellow man, but uphold their beliefs be they religious or otherwise, plaintiff has proof of discrimination by the above named defendants.
 "Frank J. Pate is named not only because he worked here as Warden at the time of the assault, but because he failed to prosecute Bobby Brieht [sic] (57578) and because he over looked [sic] the decisions of Capt. Pollman [sic] and Capt. Shifflet who are responsible to him, and the reason for naming the Department of Public Safety (now The Dept. of Corrections) is they ignored the policy that existed here for too long, their policy was rather than prosecute the criminals in the penitentiary for their crimes they commit [sic] inside these walls they 'slap wrists' and cover up and shun publicity, keeping the 'sexual assaults and criminal assaults and knifings, and deaths out of the newspapers thus leaving the operation in their incompetent hands, this same policy exists, the use of inmate Goon-Squads to beat up on Inmates, the flagrant suppression of communication in regards to treatment received here, and it is the named defendants who are guilty of these crimes against humanity, this menticide.
 [U]pon entering the socalled General Hospital after a cast was placed on my leg and I was in great pain I was SEXUALLY PROPOSITIONED BY ONE OF THE 'OFFICIAL NURSES' (Inmates) who the Department of Corrections and Frank J. Pate has saw fit [sic] to place in charge of other inmates to administer to their sickness, wounds etc., while I was in the GENERAL HOSPITAL I witnessed the stealing of NARCOTICS and the SEXUAL ASSAULT on homosexuals and other vices of various nature, these acts, these conditions contributed to menticide, during my stay in the hospital I was not allowed to purchase fresh fruit and juices to encourage 'recovery' instead I was exposed to Hong Kong Flu, T.B., and how [sic] knows what else, as even in the hospital there is no system of classification."
 While these are serious charges, there is no allegation whatever that these practices are in any way related to the assault by inmate Bright, which caused the injuries for which Gutierrez seeks $1,500,000 in damages.
 
 
 [43]
 There is no claim in this case that there was any more reason to expect that Gutierrez, rather than some other inmate, might be assaulted by Bright
 
 
 [44]
 Although we think the conclusion is evident from the language of the rule itself, to avoid any possibility of confusion we expressly hold that none of the cases need be transferred to a different judge pursuant to the provisions of Circuit Rule 23
 
 
 [1]
 Morrissey requires:
 (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. 408 U.S. at 489, 92 S.Ct. at 2604.
 The majority states:
 . . . [T]he prisoner must receive adequate advance written notice of the charges against him, he must be afforded a fair opportunity to explain his version of the incident, and, to insure a degree of impartiality, the factual determination must be made by a person or persons other than the officer who reported the infraction.
 I fail to see the logic underlying this selective limitation of Morrissey. If the state must provide a candidate for segregation with a written notice of the charges against him, it is difficult to believe that it would be substantially burdened in addition by a requirement that it append a statement of the evidence against the inmate. The same may be said of requiring a written statement of findings and conclusions by the factfinding body, once it is conceded that a hearing must be held. Moreover, meaningful review of decisions to segregate or to revoke good time is made impossible where a correctional agency fails to support its decision with findings and conclusions. See generally Davis, Administrative Law Treatise Sec. 16.05 (1958). Finally, the right of cross-examination authorized by Morrissey is subject to limitation at the discretion of the hearing officer, and I am not persuaded that prison officials would behampered in their disciplinary efforts or unduly deprived of their time by the grant of this limited right.
 
 
 [2]
 The majority may hint at this point when they state: "we find a lesser interest in liberty . . . in summary disposition of in-prison disciplinary cases than of parole revocation matters." Yet the assertion is not fortified by supporting argument
 
 
 [3]
 Affidavit of John J. Twomey, Exhibit A to Response, Gutierrez v. Department of Public Safety, No. 70 C 1778 (N.D.Ill., filed May 13, 1971)
 
 
 [4]
 Affidavit of M. F. Riley, Exhibit C to Response, id
 
 
 [5]
 Id. Riley was apparently 120 feet from Bright and Gutierrez at the time of the assault
 
 
 [6]
 The district court could more correctly have relied upon Puckett v. Cox, 456 F.2d 233 (6th Cir. 1972), and Williams v. Field, 416 F.2d 483 (9th Cir. 1969), which I read to state a view of the eighth amendment directly opposed to mine. I am persuaded by neither decision because each differs materially from Gutierrez. In Puckett, the factual basis for a claim of cruel and unusual punishment was that the plaintiff had been placed in solitary confinement after his beating by an insane prisoner; in Field, the aggressorinmate had been released to the general prison population, not to a location where he had contemporaneous access to his fellow inmates and to dangerous weapons