**Marvin Lee AIKENS et al., Plaintiffs,**

**v.**

**Russell E. LASH, Individually and as the Warden of the Indiana State Prison, et al., Defendants.**

**Civ. A. No. 72 S 129.**

United States District Court,
N. D. Indiana,
South Bend Division.

Jan. 23, 1974.

---

Harold R. Berk and Russell E. Lovell, II, Legal Services Organization of Indianapolis, Inc., Indianapolis, Ind., for plaintiffs.

Theodore L. Sendak, Atty. Gen., Robert F. Hassett, and Lon E. Mullins, Deputy Attys. Gen., State of Indiana, Indianapolis, Ind., for defendants.

## MEMORANDUM and OPINION

GRANT, District Judge.

This civil rights action, seeking injunctive and declaratory relief, was brought in forma pauperis under Title 42, § 1983 et seq., by nine (9) plaintiffs, all of whom were then inmates of the Indiana State Prison who had been transferred to that Prison from the Indiana Reformatory. Defendants Lash, Moore and Devero are the Warden, the Assistant Warden and the Director of Classification, respectively, of the Indiana State Prison at Michigan City, Indiana. Defendant Phend is the Superintendent, and Defendant Schroeder, the Assistant Superintendent of the Indiana Reformatory at Pendleton. Defendant Heyne is the Commissioner of the Department of Corrections of the State of Indiana.

The Court ordered that the action should be maintained as a Rule 23(a)(1) class action and appropriate notices were posted throughout the prison and provision made for adequate communication thereof to all inmates who were separately segregated from the general prison population.

The members of the classes similarly situated are the inmates of the Indiana State Prison who have been transferred for disciplinary reasons from the Indiana Reformatory and who were incarcerated in I.D.U. or another seclusion unit upon and after their arrival; the inmates of the Indiana State Prison who have been in the past, are in the present, or may be in the future, incarcerated in I.D.U. or D.O. Seclusion within the Indiana State Prison; and all the inmates of the Indiana State Prison who have or will communicate by mail with their attorneys.

As the date for the trial of this case approached, this Court was presented by plaintiffs with a Petition for Writ of Habeas Corpus Ad Testificandum to produce the incarcerated plaintiffs together with some twenty-two other incarcerated State Prison inmates, all of whom plaintiffs planned to call as necessary witnesses "during the course of the trial". Plaintiffs requested that each and all of the above should be transported here to the St. Joseph County (Indiana) jail (which has been duly approved for use by the U. S. Marshal) to remain here in the proximity of the South Bend Federal Courtroom (some 35 miles distant from the State Prison) for the duration of the trial. Confronted with the demands of security and countless other problems that came to mind as we contemplated this mass movement of prisoners, we concluded that we must move the site of the trial to the area where all the parties and witnesses were incarcerated (which is within the South Bend Division).

An exploratory trip to the State Prison revealed the existence of a Visitors' Lounge in the Administration Building at the entrance to the Prison, a room sufficiently large to adapt itself to conversion into a courtroom, and arrangements for the changeover immediately began. Thereupon, for the convenience of parties and witnesses, and in the interest of justice, and pursuant to the provisions of Title 28, § 1404(c), the Court entered an Order transferring the site of the trial to "the Visitors Lounge located on the main floor in the Admin-

istration Building at the Indiana State Prison, Michigan City, Indiana". That Order then continued:

The Court has on this date made personal examination of the aforesaid premises and is fully satisfied that they will be converted into an adequate and appropriate courtroom where this cause can be tried at greater convenience to the parties and the witnesses and, further, will make possible any court inspection of any such facilities or proceedings within the Prison that the Court may hereafter deem appropriate.

The announcement of the Court's Order moving the site of this trial inside the Prison's walls was timely released to the news media and received wide circulation in this Division and over the State.

This cause, originally thought to require five days, did, in fact, require ten long days and, we are satisfied, was tried with greater convenience to all concerned than could possibly have been done in our regular courtroom.

This temporary courtroom was inside the first set of electronically-controlled, locked doors that serve the main entrance to the Prison. All attorneys, all witnesses (from outside the Prison), all newsmen and the public who attended, were required to go through the Prison's frisk procedures before being admitted through this set of locked doors.

The plaintiffs, as well as the many other witnesses from within the prison, were escorted to the courtroom from their respective areas of confinement within the prison. All of this was accomplished very smoothly through the cooperation of prison officials who also made available three of their small counsellors' offices for the use of counsel on each side and as a makeshift chambers for the Judge. The change of place of the trial of this cause proceeded without the objection of any counsel or any party.

█ It is unusual, to say the least, for a United States District Court to move its deliberations inside a State Prison wall and there to inquire into the practices and proceedings of the institution. In addition to the considerable convenience to the parties and the witnesses, it also served to underscore the very important fact that every citizen— including the incarcerated felon—has an unfettered access to the courts.

Mention should also be made of the fact that our presence there made possible an unannounced inspection trip through the two segregation units involved in this controversy. With the prior knowledge and approval of all counsel and flanked only by a law clerk and one prison guide, it was possible for the Judge to walk the "range" on both floors of both units, located in separate buildings a short walk from the courtroom.

These two segregation units are commonly referred to as I.D.U. and D.O. I.D.U. is "I" Cellhouse Detention Unit. It is located on the second and third floors of a building which is actually a wing of the Administration Building and was intended for use as a "punitive" segregation unit. However, since N.S.B. (New Cellhouse Unit) was damaged in a Labor Day disturbance at the Prison, prisoners in "administrative" segregation who were formerly detained in N.S.B. are now detained in I.D.U. along with those who are in punitive segregation.

D.O. is Deputy's Office Segregation Unit. It is located in a separate building, perhaps 200 yards inside the prison walls, and gets its name from the fact that the office of the Deputy Warden is located at its front entrance. Confinement in D.O. seclusion is the most severe and harshest type of confinement at the State Prison. This two-story building is the maximum security unit of all the areas within the prison and, on its second floor, contains the solitary detention cells that were long used as "death row" for prisoners who, in earlier years, were awaiting death by electrocution.

N.S.B., referred to above, is New Cell House Detention Unit and, unlike both I.D.U. and D.O., is connected to a secure exercise area for the recreation of those detained therein. As noted above, N.S. B. has remained empty for the past four months. N.S.B. is not the basis of any challenge in this proceeding.

The amended complaint, upon which this cause proceeded to trial, raised four issues:

(1)—Plaintiffs contend that they were deprived of due process of law by their transfer from the Indiana Reformatory to the Indiana State Prison for disciplinary reasons, where, upon arrival, they were confined in I.D.U. for at least thirty (30) days without a prior hearing concerning the proposed transfer or a hearing concerning the transfer or the underlying reasons for the transfer, which did not provide them with the following rights: to advance written notice of charges, the opportunity to be present and to testify at the hearing, the opportunity to present witnesses at the hearing to testify on the prisoner's behalf, to confront and cross-examine adverse witnesses, to have the assistance of a representative and advocate who can assist the prisoner in conducting the hearing and preparing the prisoner's case before the hearing, and to have the impartial hearing body make written findings and conclusions based solely on the evidence presented to it at the hearing.

(2)—Plaintiffs contend that they are deprived of rights under the Fourteenth, Eighth, Fourth, First, Ninth, and Thirteenth Amendments to the Constitution of the United States by the practices of keeping prisoners incarcerated for more than sixty (60) continuous days in I.D. U., not allowing them out of I.D.U. cells for exercise and recreation, not providing prompt access to adequate medical services while in I.D.U., not providing opportunity and equipment for proper personal and environmental cleanliness, not providing special diets to prisoners in I.D.U., not providing sanitary and nutritional food to I.D.U. prisoners, not providing access to an adequate law library for I.D.U. prisoners, and preventing prisoners in I.D.U. from receiving literature that does not pose a clear and present danger to prison security.

(3)—The plaintiffs contend in their third cause of action that they are deprived of rights under the Fourteenth, Eighth, Fourth, First, Ninth, and Thirteenth Amendments to the United States Constitution by the following practices imposed on prisoners in D.O. Seclusion: keeping prisoners incarcerated there for more than thirty (30) continuous days, not allowing them out of their cells for exercise and recreation, not providing prompt access to adequate medical care, not providing special diets when prescribed by a physician, not providing opportunity and equipment for proper personal and environmental cleanliness, not providing sanitary and nutritional food, not providing access to an adequate law library, preventing prisoners from receiving literature which does not pose a clear and present danger to the security of the prison, and spraying chemical MACE in occupied cells as a control device.

(4)—Plaintiffs contend in their fourth cause of action that their Fourteenth, First, and Sixth Amendment rights are infringed by the practice at the State Prison of opening, reading, censoring, copying, stopping, and otherwise interfering with mail sent between prisoners and attorneys.

At the conclusion of all of the evidence, at the end of the tenth day of trial, the Court entered judgment for the plaintiffs on this fourth issue, quoting from a very recent Seventh Circuit case, Adams v. Carlson, 488 F.2d 619 (7th Cir. 1973):

Citation of authority is hardly needed for the proposition that an inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold. (Cases cited.) All other rights of an inmate are illusory without it, being entirely dependent for their existence on the whim or caprice of the prison warden.

Stiltner v. Rhay, 322 F.2d 314 (9th Cir. 1963). The judiciary, moreover, has not been content merely to keep free the lines of communication between the inmate, the courts, and agencies of correction. Whether as a vital concomitant of the prisoner's right to petition the bench or as a distinct requirement of his right to effective counsel guaranteed by the Sixth Amendment, a right of access by an inmate to counsel has been perceived by a number of courts. (Cases cited.) Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), for example, required that prison authorities allow inmates ready access to jailhouse lawyers. In the same vein, prison officials have been prohibited from interfering with postal communications between an inmate and his counsel which relate to the legality of either his criminal conviction or the conditions of his incarceration. (Cases cited.), even where the lawyer is not the inmate's counsel of record. (Cases cited.) The final phase of this development has been a recognition that the effective protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context. Thus there has been widespread agreement that communications by post between an inmate and his attorney are sacrosanct, subject only to tests on incoming mail for the presence of contraband which fall short of opening it when the inmate is not present. (Cases cited.)

Continuing further, the Seventh Circuit in *Adams* said:

To justify his impairment of communication between attorneys and inmates in the name of security, a prison warden must come forward with facts which tend to support a reasonable suspicion not only that contraband is being smuggled to inmates in the face of established preventive measures, but that their attorneys are engaged in the smuggling. * * * prison authorities may not restrict the exercise of constitutional rights by those in their charge without showing a threat to the order or security of their institution.

Finding no showing in the case here before us that there had been any threat to the order or security of the State Prison, the Court ordered that attorney and client must have a free opportunity to communicate by mail and that opportunity must not be encumbered by the chilling effect of the mail having been opened in the prison office.

At any such time as the prison authorities may have reasonable grounds to believe that any piece of attorney-client or client-attorney mail may contain contraband of any kind, then and only then may a prison official open such item of mail, *but only in the immediate presence of the inmate involved,* and such item of mail shall at that time be promptly handed over to the said inmate, all without any reading, censoring, copying, or further interfering with the prompt deliverance or transmission of such item of mail.

### HEARINGS UPON TRANSFER TO STATE PRISON:

We do not here consider the question of the power of the State to transfer its prisoners from one institution to another. The transfers from the State Reformatory to the State Prison, which are an issue here, are those cases where the inmate has engaged in what the Reformatory staff considers objectionable behavior. Plaintiffs refer to these as "disciplinary" transfers while the defendants term them "management problem" transfers. The difference is wholly one of semantics. By whatever name they are called, the loss to the prisoner is equally grievous.

Prior to July 1, 1972, inmates subjected to a disciplinary transfer were not provided any hearing concerning that proposed transfer. All of these named plaintiffs were transferred prior to July 1, 1972, and none of them received any hearing on his proposed transfer. Prior to July 1, 1972, (and since), a prisoner

who had been subjected to a disciplinary transfer was allowed to file an appeal with the Commissioner of Corrections *challenging the already completed transfer.*

After July 1, 1972, a Reformatory prisoner, under consideration for transfer, was provided a two-stage hearing. He first appears before the Conduct Adjustment Board (CAB), and if that Board recommends a disciplinary transfer, then the inmate receives a hearing before the Reformatory's Classification Committee. The prisoner may object to the proposed transfer and state his reasons for objecting. However, he is not permitted to produce any witnesses on his behalf nor may he cross-examine his accusers. He is not permitted counsel nor a lay advocate.

Under new regulations, which were announced during the pendency of this cause and became effective August 27th, 1973, only major violations, as defined therein, can result in confinement or transfer. These new procedures make no specific provision for written notice of the nature of the charge in advance of any hearing nor the opportunity to call or to interview witnesses, the opportunity to confront and cross-examine accusers, nor the right to be represented by a lay advocate or by an attorney in cases of a serious nature. These new procedures now provide the basis for both disciplinary transfers to the Prison and also in-prison disciplinary segregation at both the Reformatory and the Prison.

The disciplinary transfers (as we shall hereafter refer to them) are largely for the benefit of the Reformatory and generally apply to an inmate who is a chronic disciplinary problem and, therefore, injurious to the proper functioning of the Reformatory's programs. In most cases, an internal conduct report, or series of reports, have served as the basis for the transfer but some inmates have been transferred without any conduct reports.

The Reformatory has a lower security rating than the Prison. The Prison is classified as "maximum security", and the Reformatory is described in the defendants' answer as a "medium to maximum security institution". The Reformatory has a broader range of programs for the prisoners. The Prison has more segregation units than the Reformatory and, thus, is designed to handle the more difficult prisoners and ones with severe behavior problems.

Upon being transferred to the State Prison as a disciplinary problem, the inmate is placed immediately in I.D.U. and is kept there for a minimum of thirty days. As indicated above, I.D.U. is a segregation area designed for punitive segregation, i. e., for prisoners who have been found guilty of serious conduct reports at the Prison. It is composed of 95 single occupancy cells with solid walls, each with a bar front, each approximately 5½ feet wide, 10 feet long, and 7½ feet high, and containing a bed, a mattress, pillow, pillow case, two sheets, one blanket (two in winter), a commode and wash basin—both operated by the inmate, a cabinet, one 47″ or 48″ fluorescent light in the ceiling, and a three-station radio system that the inmate may listen to day and night, on radio earphones. Prisoners confined in I.D.U. are not allowed outside their cells for exercise and are only temporarily released for visits or hospitalization but few other reasons. A prisoner in I.D.U. who is on a "treatment program", i. e., whose good conduct may cause his release from his cell and permit him to walk in the walk-way in front of the locked cells, will work at menial chores in the unit. On one given day about which considerable testimony was elicited, there was but one prisoner on the "treatment program" on the floor concerned. Showers are provided to prisoners once a week or once every two weeks, or more at times. There are complaints of bad sanitation, inadequate medical services, and the lack of a special diet where prescribed by a physician.

The named plaintiffs herein spent an average time of sixty days in I.D.U.

upon their transfer from the Reformatory. Plaintiff Aikens, at the time of trial, had been confined in I.D.U. some eighteen months.

Prisoners who are transferred to the Prison for other than disciplinary reasons are not confined in I.D.U. upon their arrival. Those who arrive there because they have requested transfer to the Prison are assigned to a cellhouse in the general prison population upon their arrival. New prisoners who are received at the Prison after sentence by a court and assignment to the Prison by the diagnostic center are confined in the Admittance and Orientation Unit for a week or two before they are released to the general population. It is only disciplinary transferees who are confined immediately, and for not less than thirty days, in I.D.U.

A member of the Prison's Parole Board testified that a disciplinary transfer will not in and of itself, and apart from consideration of behavior, be a ground for denial of parole, but he admitted under cross-examination that the Parole Board takes the disciplinary transfer of a prisoner into consideration in making their own decision as to whether or not to grant parole. The actual behavior of the inmate is uppermost in the Board's view and they learn of that behavior by reading the institution's record including conduct reports, if any, and disciplinary transfer recommendations.

Inasmuch as the conduct report becomes the basis for a disciplinary transfer, it follows that the procedures applicable to the determination of guilt or innocence on that conduct report are an inherent part of the disciplinary transfer process. These disciplinary transfers are procedurally identical to the normal in-prison disciplinary situation where a prisoner is charged with an offense, found guilty, and confined to segregation. In the case of the transferred prisoner, he is automatically confined in the same segregation unit upon arrival at the Prison.

We first must deal with the threshold question whether the requirements of due process apply to this transfer process in the first place. Due process has been held to apply whenever important rights and interests are at stake. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). "Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer *grievous loss.*'" (Emphasis supplied.) Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ If the requirements of due process do apply, then the interests of the government and of the prisoner must be balanced in order to determine just what process is due. Board of Regents v. Roth, 408 U.S. 564, 570, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

"The government has three important interests at stake: (1) effective administration of the prison, (2) 'effect that the introduction of procedural safeguards may have on legitimate prison functions,' Landman v. Royster, 333 F. Supp. 621, 652 (E.D.Va.1971), and, (3) most important, rehabilitation of the prisoner." Croom v. Manson, 367 F. Supp. 586 (D.Conn.1973).

The First Circuit Court of Appeals has detailed the important interests of the prison in these words:

Wholly apart from the specifics of this case, we think it well recognized that transfer characteristically entails inconveniences and privations. Some arise by the distance factor alone, increasing the difficulty of communication and visitation. See Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972). Other disadvantages stem from the breaking off of established programs, both educational and rehabilitative, and reorientation to a new setting, programs, rules and companions. Still other privations exist by reason of the administrative requirements of the receiving prison. New inmates must often be subject to "administrative" iso-

lation pending examination, classification, and integration into a new prison community. Although the reason for this segregation may be distinguished from the reason for punitive segregation, the impact upon the inmate is no less. Finally, if the fact of transfer noted on an inmate's record without further explanation connotes "troublemaker", the inmate may be faced with recurrent unfavorable dispositions as to his status within the prison and might eventually suffer an unfavorable parole decision, resulting in a longer term adverse alteration of the inmate's living conditions. Gomes v. Travisano, 490 F.2d 1209 (1st Cir., 1973).

The United States Supreme Court has held in Morrissey v. Brewer, *supra*, that the requirements of due process do apply to parole revocations. The Court said:

. . . the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others . . . . By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its determination calls for some orderly process, however informal. (See p. 482 of 408 U.S., p. 2601 of 92 S.Ct.)

Shortly thereafter, the Supreme Court in Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656, held that due process mandates that the same hearings be held in the case of a probationer under the same conditions as specified in *Morrissey, supra*. In *Gagnon*, the Court said:

Petitioner does not contend that there is any difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation, nor do we perceive one. Probation revocation, like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of liberty. Accordingly, we hold that a probationer, like a parolee, is entitled to a preliminary and a final revocation hearing, under the same conditions specified in Morrissey v. Brewer, *supra*.

In United States ex rel. Miller v. Twomey, 479 F.2d 701, 717 (7th Cir. 1973) the Seventh Circuit, in several consolidated cases involving the adequacy of in-prison discipline regulations relating to the administration of State Prisons, said:

As the Chief Justice stated in *Morrissey*, the question whether any procedural precautions are due depends on the extent to which an individual will be condemned to suffer "grievous loss." 408 U.S. at 481, 92 S.Ct. 2593. Quite obviously not every adverse change in a prisoner's status, even assuming it impairs his residuum of liberty, is sufficiently "grievous" to amount to a constitutional deprivation. The consequences of conviction of crime involve not merely the loss of liberty enjoyable in a free society, but additionally the subsequent relatively minor impairments which are inevitably associated with membership in a closely supervised prison community. On the other hand, we are also convinced that additional punishment inflicted upon an inmate may be sufficiently severe, and may represent a sufficiently drastic change from the custodial status theretofore enjoyed, that it must be classified as "grievous loss."

The records before us describe a sufficient contrast between the privileges associated with membership in the general prison population and the severe restraints resulting from "segregation" to warrant the conclusion that prolonged segregated confinement is a "grievous loss."

After concluding that the requirements of due process do apply in two of the cases included in Miller v. Twomey, *supra*, the Seventh Circuit then discussed at some length the Supreme Court's procedural safeguards laid down in *Morrissey, supra*, for a parole revoca-

tion hearing,[1] and then concluded in these words:

> Since we find a lesser interest in liberty and a greater state interest in summary disposition of in-prison disciplinary cases than of parole revocation matters, we believe *Morrissey* describes the maximum procedural safeguards required by the application of the due process clause to an in-prison proceeding. In any case which may involve "grievous loss," we believe the bare minimum is that applicable to a proceeding which may result in the revocation of statutory good time, namely, an adequate and timely written notice of the charge, a fair opportunity to explain and to request that witnesses be called or interviewed, and an impartial decision maker. (See *Miller, supra,* at p. 718.)

Instead of fashioning the exact procedural safeguards to be applied in each of these cases before it, the Seventh Circuit remanded the cases to the respective District Courts for hearings "dealing solely with the matter of relief . . . and for those situations in which due process is required they must also determine the extent to which the maximum standard identified in this opinion need to be supplemented or clarified".

It is noted that this Circuit in Adams v. Carlson, *supra,* commenting on its earlier opinion in Miller v. Twomey, *supra,* had this to say:

> *Miller* involved disciplinary hearings aimed at imposing a grievous loss of liberty on an inmate, a deprivation which we viewed as equivalent to that suffered by a parolee upon his return to prison. In dealing with the topic of parole and its revocation in Morris-

sey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court—conceding that "the full panoply of rights due a defendant in . . . a [criminal] proceeding does not apply to parole revocations," 408 U.S. at 480, 92 S.Ct. 2593—held that the liberty of parole was nonetheless valuable and under the aegis of the Fourteenth Amendment. What a prisoner suffers upon segregation, then, differs from what he suffered upon conviction by shades of degree, not of kind. That the prisoner is convicted by an administrative prison board instead of a court makes no significant difference. Nor does it matter that *Miller* and this case arise in a civil rather than a criminal context.

Applying the rationale of *Miller, supra,* to the case before us leads to the inescapable conclusion that the requirements of due process apply here to the "prolonged segregated confinement" at the Prison that automatically awaits the prisoner after a disciplinary transfer from the Reformatory, and we now turn our attention to the question as to just what process is due.

In a true emergency situation, one wherein the general security of the institution is immediately threatened a disciplinary transfer, as the term has been used herein, may be allowed without a prior notice and hearing, provided, however, that where such an emergency transfer is effected, the transferred inmate must be given a hearing within five days of the date of his arrival at the transferee institution, and all according to the minimum standards set forth below. In this connection, however, we quote with approval the follow-

---

1. The Supreme Court's subsequent opinion in Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), was not yet before the 7th Circuit at that time. See Miller v. Twomey, supra, footnote 36. In *Gagnon, supra,* the Supreme Court re-adopted its *Morrissey* standards and applied them to a probation revocation hearing. However, it rejected the Seventh Circuit's holding in Gunsolus v. Gagnon, 454 F.2d 416 (7th Cir. 1971), re-

quiring the appointment of counsel in all probation revocation hearings and held, instead, "that the decision as to the need for counsel must be made on a case-by-case basis in the exercise of a sound discretion by the state authority charged with responsibility for administering the probation and parole system". *Supra,* at p. 790 of 411 U.S., at p. 1763 of 93 S.Ct.

ing language of the Court in Kessler v. Cupp, 372 F.Supp. 76 (D.Or., 1973):

It should be crystal clear, however, that the determination of the institution-wide emergency situation is one which calls into play the informed expertise of the Superintendent or Warden. Courts cannot and should not "second guess" Wardens on this score.

 Except for the emergency situations referred to above, the following minimal due process standards shall apply to all disciplinary transfers:

(1)—An advance written notice of the fact that a transfer is contemplated which shall include a statement of the reason or reasons for the proposed transfer. As required in Miller v. Twomey, supra, this notice must be both "adequate and timely", which shall be construed to mean notice given not less than two days before the date and time of the hearing.

(2)—An impartial decision maker. This may be one or more institution personnel, but it may not include any such prison personnel who have participated in the investigation of the case or who have been accusers in the case or who have been involved in the recommendation to transfer.

(3)—A fair opportunity to explain. The inmate shall be entitled to appear and to speak in his own behalf.

(4)—A fair opportunity to request that witnesses be called or interviewed. They shall be interviewed in his presence, including his right of cross examination of the adverse witness, unless the hearing officer or Board determines that good cause exists to deny the right of confrontation, in which case the written record shall reflect sufficient proof .of the reliability of the absent or anonymous informant.

(5)—Representation by lay advocate. The inmate shall be allowed the assistance of a lay advocate of his own choosing, provided, however, that such lay advocate shall be an inmate in that same institution who is not then in segregation.

(6)—A written statement of findings of fact, based on substantial evidence, shall be made and a copy provided to the inmate.

(7)—There shall be an administrative review of the decision by the Commissioner of Corrections or his designate.

We believe the above minimal procedural safeguards are both reasonable and feasible and, furthermore, in light of the testimony adduced at this trial, would present no problems to the administration of the institutions involved.

[6] This Circuit, in Adams v. Carlson, supra, 488 F.2d at pages 625–629, held Miller v. Twomey, supra, to be "entirely retroactive" and in reliance thereon, we here decree that adequate procedural hearings, with not less than the new procedures hereinabove set forth, shall, within a period of the next ten (10) days be provided to all prisoners in segregation who are there pursuant to a disciplinary transfer from the Indiana State Reformatory.

"I" CELLHOUSE DETENTION UNIT

This segregation unit, commonly known as I.D.U. was originally intended for use in punitive segregation but, as noted above, it has also been commonly used as a "holding" or "quarantine" unit for disciplinary transferees from the Indiana State Reformatory.

Plaintiffs contend that long-term confinement therein, under the living conditions and manner of operation, constitutes a deprivation of rights under the Fourteenth, Eighth, Fourth, and First Amendment to the United States Constitution.

A physical description of I.D.U. was stated above. It should also be noted that I.D.U.—located on the third floor —is served only by a tediously slow-moving passenger elevator that provides the usual means of passage in or out of the unit. A seldom-used rear stairwell—interrupted by at least three different sets of locked doors—is said to be available as an emergency exit. However, there was uncontroverted testimony in this

case that on one weekend a guard, stationed in this unit (I.D.U.), had taken some keys home for the weekend and at least one inmate was locked in a cell that no one in the Prison was able to open for at least two days. These facts, considered together, could provide the basis for untold tragedy in the event of dire emergency.

Prisoners are confined in I.D.U. twenty-four hours a day and, as noted above, are not allowed outside their cells for exercise and are only temporarily released for visits or hospitalization, but for few other reasons. These prisoners are taken out of their cells, at best only once a week, to shower and shave. Many times there are much longer intervals between showers. Prison officials contend that their shortage of manpower makes it impossible to provide more frequent showers.

It is admitted that a severe noise problem exists. Communication between prisoners is accomplished by shouting to other cells up and down "the range". The intensity and length of these noisy conditions cause tension, anxiety, and distress to the prisoners and also to the attendant staff.

Plaintiffs and the other inmates testified at length about the poor quality of the food and its service. The segregation units are provided the same food as the rest of the general prison population. The menu for each week is based upon a recommendation of the Director of Food Service for the State, who is a licensed dietitian. Food to these units is delivered by an electronically-controlled hot food cart. Tests have shown that there is a loss of but 4° or 5° in transporting these carts from the kitchens to the seclusion units. For the present, a prisoner in segregation is not able to receive a special diet, except that he be transferred to the hospital. Prisoners in the general population do receive a special diet, when prescribed, but Prison officials again plead lack of sufficient manpower as a reason for not now delivering special diets to those in segregation.

Plaintiffs complain of the use of paper plates, which soak up food, but Prison officials state that paper plates become a necessity after some inmates in segregation were breaking the stainless steel trays formerly in use and converting them in some cases into weapons. The Chairman of the United States Board of Parole testified that in his experience paper plates were necessary for security purposes. It should be noted here that the Prison kitchen and dining room are now in the process of being remodeled.

Plaintiffs complained of lack of medical care. Two full-time physicians who live on the grounds at the Prison make rounds in these detention units once a week. At other times a complaint from a prisoner to the guard on duty should produce a phone call to the Prison hospital and a visit by an "inmate nurse" who takes the inmate's vital signs and suggests hospitalization if thought necessary. Six beds are maintained at all times at St. Anthony's Hospital in Michigan City for surgery. Specialists in many fields are engaged on a consulting basis.

True, these services are not as adequate nor nearly as speedy as the plaintiffs demand but countless citizens outside the Prison walls will testify that doctors are busy people and are not always ready to break and run the moment we demand them, day or night.

Plaintiffs produced expert testimony on the adverse physical and mental effects of long-term confinement in segregated cells. However, in almost every case, this testimony only served to emphasize the acute shortage of personnel, both professional and non-professional, at the Prison. There were, at the time of the trial, 11 or 12 inmates who had been adjudged as psychotic by one of the two contractual psychiatrists who serve the Prison. They were housed either in segregation or the hospital, or kept in Admittance and Orientation. The recommendation from the Prison that these inmates be transferred to a psychiatric hospital was, in most cases, denied by

the Mental Health Department of the State of Indiana.

It should be borne in mind that the two consulting psychiatrists who serve the State Prison provide only diagnostic services. *They do not provide treatment.* When psychotic patients are denied transfer to the State Psychiatric Hospital, they receive no treatment at all. Recognizing the serious problems developing in this area, the Warden of the State Prison, some months ago, called a meeting to point out to a representative of the State Mental Health Unit the seriousness of these lack of transfers and that the Prison does not have the staff to help these mentally troubled inmates. It was pointed out that over the past year only about 10% of those psychotic inmates were accepted by the Mental Health Department.

Testifying concerning this meeting, the Assistant Warden said "And we pointed out (to them) that we are going down the drain, so to speak, in this area. These inmates are absolutely doing nothing but vegetating. And they are getting worse. We do not have the facilities whatsoever." The Mental Health people recognized the problem and responded that the Prison "should have at this institution at least a psychiatrist half-time, at least half-time". At the time of trial, there was still no psychiatrist, half-time or any time at all—for treatment purposes—and the Prison officials "are still sitting here with our men".

This is a sad commentary on prison administration today, in what we take pride in calling an "enlightened society".

In the non-professional personnel area, all of the experts in the field of penology who testified, on both sides, recognized the great shortage of guards and counselors and other personnel as contributing to the basis of problems at the institution. Several felt there should be at least twice as many personnel—at least 400 rather than the 200 or less presently employed. In addition to the fact that the understaffing of these units at times deprives the inmates of a minimum of reasonably humane services, there is the problem of a very dangerous situation for the limited guard personnel who are on duty. If these problems are to be met and adequately dealt with, the citizens of this State must demand of their legislators that they recognize and make decent provisions for the administration of their prisons, as well as their state mental institutions.

On July 11, 1973, an apparently troubled inmate, who had been confined in I.D.U. at his own request, committed suicide. For three or four days, he had "hollered" and banged on his bed and shouted, "They're going to get me." The taunting of his neighboring cellmates only added to the confusion and the din. A porter on the floor who was an inmate nurse was first to notice the man's body hanging from strips of cloth he had torn from his trousers. The porter urged that he be permitted to go to the aid of the hanging inmate but, again, a shortage of guard personnel dictated that, with only two guards on duty on that floor, one of them was not permitted to unlock a cell because to do so he would have to enter the unit alone. There was discrepancy in the testimony as to how much time actually elapsed before an additional officer arrived at the unit and it was possible to open the cell, at which time the inmate was pronounced dead.

Segregated confinement in I.D.U. as presently administered, is objectionable. It is most undesirable from any point of view. It does not serve the needs of the State because it cannot possibly assist in rehabilitation of the prisoner—one of the important aspects of prison life in the late twentieth century. At present these cells can only breed hate and scorn and contempt for prison officials and for the law. If we are to accomplish anything in the area of rehabilitation, we must learn to handle even the law violator in a lawful, humane manner.

We refer back to Adams v. Carlson, *supra,* wherein the Seventh Circuit considered plaintiff's claims that *indefinite*

segregation constitutes cruel and unusual punishment. Regulations at the institution provided for periodic review, to consider "whether infractions committed by an inmate while in segregation justified his continuation in that status". Commenting on that situation, the Seventh Circuit Court of Appeals said:

As long as the . . . question is asked and answered in an adversary setting identical to that which attended the original placement of the inmate in segregation, *we see no constitutional infirmity* in a scheme of indefinite placement.

We note that the new regulations which became effective on August 27th, 1973, provide for review every thirty days of the cases of those confined to indefinite term in segregation. Accordingly, we find no constitutional infirmity in a scheme of indefinite placement in segregation provided such review is conducted in "an adversary setting" identical to that herein before set forth by this Court.

On the date of final argument in this cause, January 14, 1973, the Deputy Attorney General advised this Court that the Indiana General Assembly, now meeting in regular session, has for consideration a bill authorizing the employment of additional personnel at the State Prison and, further, that there are indications that a renovation of I.D.U. is under active consideration. In addition, he advised that N.S.B., supra, is being renovated, that contracts have been let for the complete restoration of N.S.B. as a segregation unit, and that such plans may encompass the closing down of D.O. totally. He further reported that since these hearings were closed, 16 additional inmate nurses have concluded a full course of training.

As we noted in this opinion, N.S.B. is served by a securely guarded outdoor exercise area, with lighter cells and better access to the unit, and can be converted into a very adequate segregation unit.

We are willing to error on the side of caution and deliberation (if error it be) in expressing some hope and confidence that an aroused citizenry and an enlightened legislature are at long last in the actual process of recognizing and meeting many of the crying needs of our Indiana prison system. (We do not intend to suggest that this same problem does not exist in many other states. Testimony of experts at this trial would suggest that the conditions in Indiana's prison system might be about average for all the States of the Union.)

We find support for this position in the Seventh Circuit's language in Miller v. Twomey, *supra*:

Instead of attempting in this opinion to fashion the precise relief which is appropriate, we believe both district courts should hold hearings dealing solely with the matter of relief. And before those hearings are held, we believe the respective defendants should have an adequate opportunity to prepare the kind of procedural regulations which they consider appropriate in the light of this opinion.

\* \* \* The judiciary cannot avoid its ultimate responsibility for interpreting the constitutional requirements of due process. Certainly that responsibility cannot be delegated to prison authorities. But neither should their expertise nor their assistance in accurately identifying and evaluating the interests at stake be ignored. These cases represent a stage in the development of an extremely important phase of constitutional law. It is appropriate that the development proceed with full deliberation. (See pp. 718–719, of 479 F.2d.)

Thus, we hold against the plaintiffs on their constitutional challenges against I.D.U. Seclusion Unit. However, we will maintain jurisdiction of their claim in order that, if need should exist, we may take another look at this claim after the 1974 Legislature shall have an opportunity to act, and we may review the claims in light of the situation then existing.

DEPUTY'S OFFICE DETENTION UNIT:

This unit, commonly known as D.O. Seclusion, is quite something else. There are some 49 single occupancy cells in D.O. Seclusion. The unit has two floors and is located back of the Deputy's office, hence its name. It has all the infirmities of I.D.U. (except the elevator service) and many more. In past years it was called "Death Row", a place where prisoners were confined who were awaiting the death penalty by electrocution. These cells in D.O. have solid cement walls, roof, and floor, in addition to the iron-bar door. These cells are 9′–2″ long, 6′–2″ wide, and 11′ high. They are painted gray and have a window on the back covered by a metal plate which permits neither air nor sunlight to enter the cell at any time.

There is an approximately three-foot entryway between the inside iron-bar door and an outer wooden door which is solid except for a 2-inch peephole and which, when closed, shuts out all air and light from the outside. Within this entryway is located one light bulb which illuminates the cell through the iron-bar door. There is no light within the cell itself. The unit is only dimly lighted and the only natural light is that which is admitted through windows at either end of the long hallway which separates two rows of cells as described above. The cells are damp, which fact was easily confirmed by a walk through the two floors of the Unit.

Ventilation in these cells is very poor and, as a result, the cells are hot and damp, as well as dingy and dark. Each cell has a cot-type bed, a commode without a cover, and a sink. Most of the cells on the second floor have commodes that are controlled by the inmate-occupant. However, the flushing of the commode and basin in the first floor cells is controlled by the officer or porter on duty in the Unit. The periodic flushes are supposed to be accomplished four times an eight-hour shift, i. e., when the officer makes his regular rounds. At other times, an inmate will "holler" at an officer if he needs a flush, but testimony suggested that these appeals were not always heeded.

Confinement in D.O. Seclusion is the most severe and harshest type of confinement at the State Prison. The problems of noise are even more pronounced than those referred to in I.D.U., supra. Part of this problem stems from the fact that prisoners with severe emotional and mental problems are confined in this Unit.

As in I.D.U., prisoners are taken out of their cells at intervals of one week or more, to shave and shower. At times these intervals between showers have been weeks. Here again, Prison officials plead lack of personnel to escort inmates to the showers. The Warden testified that there were times when he had to "close the Prison down" for a day or two to free the guard personnel so that they might provide showers for men in D.O.

Within the D.O. Seclusion area are several cells which are classified in prison parlance as "strip cells". These cells have a commode and wash basin, but nothing else. The lights are not turned on in the entryway, thus keeping the cell in total darkness except at mealtime and on Friday for two hours. Late in the afternoon, a mattress is delivered to the cell, although some prisoners are reported to have been kept in a "strip cell" with no mattresses at any time. The mattress, when delivered, is taken away each morning.

Chemical Mace was sprayed at noisy prisoners locked in their D.O. closed cells to quiet them and, following that, their outer wooden door was closed, confining the prisoners in their cells with the gas.

During the course of trial, we received the testimony of many witnesses, from coast to coast, experts in the field of penology, who inspected D.O. Seclusion and gave their professional apprais-

al of the Unit. Some pointed excerpts from their testimony follow:

"It is about the worst I have seen any place. It is a mess. It ought to be torn out. I tell you why it ought to be torn out: Not because I feel particularly sorry for inmates that are in there, but I would tear it out as a question of public safety. A man that goes through that and then is put on the streets is a danger to the public."

". . . especially D.O. Seclusion as it is operated in this institution, functions to the degradation and dehumanization of the men who are incarcerated in those cells. * * * I went up to one cell, for example, and I introduced myself and the man grabbed the bars and he started yelling and screaming obscenities; his eyes were bulging, and in spite of some calls from other men in the cells to calm him down, he didn't. He yelled and I immediately left. * * * As it is presently operated, I don't think anyone should be confined in D.O. Seclusion."

"D.O. Seclusion, as it is operating now, is not for men; it is for animals. Those are not cells; they are cages. We can't call them by any other name."

Lawrence A. Carpenter, who served twenty years with the Federal Bureau of Prisons and who was the Executive Director of the Corrections Task Force of the National Advisory Commission on Criminal Justice Standards and Goals, stated that:

"The conditions . . . in that unit don't meet any standards whatsoever—human standards, the standards of the Commission. It is one of the worst units, if not the worst housing unit, I have ever seen in 30 years of prison work in visiting scores of prisons around this country. It could be called a "dungeon" except that it is not subterranean, but it might as well be subterranean because there is no daylight coming in there; the cells are dark cells; there's a high window in the back that used to apparently admit light and air, but they are blocked up so they admit neither now. There is no air circulation whatsoever in those cells. The light is hopelessly poor. Many of the men—as I talked to them, their bodies were rank with odor and the air was close, and I think it is sadistic to put inmates overnight in that type of quarters, let alone having to stay there for months and even years at a time. And I see no useful purpose to be served by continuing the use of that unit a day longer. It should be closed. It should be closed and the building razed or gutted and rebuilt for some other purpose."

* * * * * *

[The Eighth] Amendment may be violated either by the intentional infliction of punishment which is cruel or by such callous indifference to the predictable consequences of substandard prison conditions that an official intent to inflict unwarranted harm may be inferred. Miller v. Twomey, *supra*, at 719–720.

In Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), the Supreme Court reminded us that:

. . . the words of the [Eighth] Amendment are not precise, and . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

Furthermore, the Chief Justice, dissenting in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) wrote:

. . . the standard [of extreme cruelty] itself remains the same, but its applicability must change as the basic mores of society change.

Applying this principle to the penal system, it has been stated that courts must recognize the advancement of knowledge of the effects and purposes of the penal system made by sociologists, psychologists and penologists, rather than fixing the 8th Amendment on 18th Century theories.

Justice, then Judge, Blackmun wrote in Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968), that:

[The test involves punishment that] offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess.

▓ Applying these principles to the facts as we find them to be in the D.O. Seclusion Unit, we now find that the totality of the conditions in the D.O. Unit per se, violate the plaintiffs' rights against cruel and unusual punishment as guaranteed by the Eighth Amendment to the Constitution of the United States. The conditions therein existing are shockingly inhumane and have no place in today's penal programs. The conditions there threaten the sanity of the inmate and are abhorrent to any efforts at rehabilitation.

▓ The Court is mindful of the problems inherent in the transfer of all those prisoners presently confined in D. O. Seclusion. They must be moved to other detention areas or, upon rehearing, in some cases released to the general prison population. We believe and we find that a period of twenty (20) days after the entry of an appropriate order herein should provide ample time to effect the transfer of all D.O. inmates in compliance with this decision.

The plaintiffs challenge the use of Mace in the D.O. Seclusion cells, but inasmuch as we find D.O. Seclusion to be constitutionally impermissible and are ordering that it be closed, the question of the use of Mace therein becomes moot.

ACCESS TO ADEQUATE LAW BOOKS BY PRISONERS IN SECLUSION:

Prisoners confined in I.D.U. and D.O. are not given access to any law books kept at the Prison. Prison officials do not permit these books to be taken out of the writ room (the law library) except by an officer and there are not sufficient officers available to make these books available. The scanty law library that does exist is wholly inadequate. There are but two copies of the Criminal Statutes from Burns' Indiana Statutes and these have only 1971 pocket supplements therein. There are some volumes of U.S.Code but the most recent supplement was dated back in the sixties. Most of these books were donated by universities and some by the LaPorte Circuit Court. The Prison is purchasing some books and supplements at this time, but they are not purchasing supplements to Burns' Indiana Statutes.

We must first decide whether prisoners in segregation are entitled to access to law books and, second, whether the Prison law library is adequate and sufficient.

The Seventh Circuit recently answered this first question in the affirmative in Adams v. Carlson, supra:

Along with the recognition of a prisoner's rights of access to the courts has come the realization that a prisoner must have access to legal materials, particularly where he is unable to retain counsel and must petition the courts pro se. 488 F.2d p. 632.

More recently, the Seventh Circuit reaffirmed this position in Knell v. Bensinger, 489 F.2d 1014 (7th Cir. 1973):

The complete frustration of a prisoner's attempt to consult an advisor or to use the prison law library may constitute an effective denial of access to the courts, quite apart from the denial of the right to send mail to the court . . . P. 1017.

▓ Finding as we do that these plaintiffs do have a right to access to adequate legal materials, we further find that that right is seriously infringed by the limited nature of the book list, the fact that many volumes of Federal Supplement and Federal Reporter (2nd) are missing and, what is more vital, the fact that Statutes and Digests are not kept current.

CENSORSHIP OF LITERATURE MAILED TO INMATES:

The Director of Classification at the State Prison has been delegated the duty of inspecting and censoring incoming literature. Although certain publishers and periodicals are automatically banned, the Director examines each issue of other periodicals and determines individually whether each should go in. In making these censorship determinations, the Director follows a policy position paper on censorship prepared at the Prison two or three years ago. The evidence disclosed, however, that the actual censorship practice at the Prison is even more restrictive than either the Prison's censorship paper or a broader policy adopted by the Indiana Department of Correction. As an example, "Playboy" magazine is prohibited at the Prison, although it is permitted at the Indiana Reformatory.

In Cooper v. Pate, 382 F.2d 518 (7th Cir. 1967), this Circuit approved the district court's standard that a prisoner has the burden of showing that the censorship of his newspapers and publications was an abuse of discretion.

Plaintiffs point out that at least six Circuits have considered the disputed communications in terms of whether the state could demonstrate compelling state interests requiring exclusion or whether the writings constituted a clear and present danger to the security of the Prison.

This *conflict of positions* will most certainly be dealt with in a case which has been reheard *en banc* by the Seventh Circuit Court of Appeals, Morales v. Schmidt, 489 F.2d 1335 (7th Cir. 1973), and we shall withhold decision on this question until this Circuit's *en banc* decision can be considered. This question shall then be the subject of a supplementary decision in this case.

No witness who testified in these ten days of trial contradicted the glaring fact that the Prison is woefully short of personnel, both in medical staff and guards. It would serve no useful purpose to add to the length of this opinion by reciting all of the testimony of incidents where, time after time, an acute shortage of personnel caused inmates in seclusion to go without law books, showers, exercise or any kind of recreational program, special diets and psychiatric care, etc. That list could go on and on.

We conclude this Memorandum with a further quote from the aforementioned Mr. Lawrence A. Carpenter:

Every Warden feels he has a shortage of personnel, but I will concede—I would hate to be the Warden of this institution and have to develop programs and control the population—do all the things that have to be done with 180 personnel or even 200. I think the personnel here are faced with one tough job. There's just no question about it. I wouldn't indict them for a minute. * * *

. . . it is criminal negligence on somebody's part not to see that this institution is provided with the personnel it should have. Now I don't know who is responsible for that. You certainly can't hold the Warden responsible. Probably there's a number of people responsible—

(The Court interjected: Who do you think it is?)

I would think it is shared by a number of people. Maybe the public doesn't care. Maybe the Legislature doesn't care. I'm not familiar enough with the Indiana situation to know what representations the Corrections officials have made to the Legislature.

(The Court interjected: Is this problem in Indiana different than that that you found in other States?)

The problem is shared—most Correctional Agencies are unsupported. There's no question about that, but the problem in Indiana is—this place is among the worst I have ever seen. This personnel shortage here and the general conditions are among the worst I have seen. But, as I say, I wouldn't criticize the personnel here for much of the conditions that exist

**500**

because of the conditions under which they have to work. You can't control 1,500 men in a place like this with 180 personnel.

In the proposed Order which plaintiffs may tender, they should suggest what additional law books need be acquired in order to establish at the State Prison a constitutionally adequate law library.

The Court concludes that the ends of justice will be served by the issuance of injunctive relief, in compliance with this decision. Plaintiffs' counsel is invited to prepare and submit proposed findings, decree and injunctive relief consistent with the foregoing Memorandum of Decision.